984 F.2d 991
 Charles K. ELDER; Beverly S. Elder, husband and wife,
Plaintiffs-Appellants,
v.
R.D. HOLLOWAY; Other Unknown Employees and/or Agents,
individually and in their official capacity as
police officers for the Ada County
Sheriff's Office, et al.,
Defendants-Appellees.
 No. 91-35146.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 27, 1993.
 
 Prior Report: 975 F.2d 1388.
 John Charles Lynn, Lynn, Scott & Hackney, Boise, ID, for plaintiffs-appellants.
 James J. Davis, Boise, ID, for defendants-appellees.
 Before: WALLACE, Chief Judge, HUG, and RYMER, Circuit Judges.
 
 
 1
 The panel has voted to deny appellants' petition for rehearing and to reject the suggestion for rehearing en banc.
 
 
 2
 The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.
 
 
 3
 The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.
 
 
 4
 KOZINSKI, Circuit Judge, with whom Circuit Judges PREGERSON, NORRIS, REINHARDT and TROTT join, dissenting from the order rejecting the suggestion for rehearing en banc.
 
 
 5
 It is not every day that one witnesses the birth of a totally new legal doctrine. And with good reason. Established legal principles, honed over decades--sometimes centuries--generally have much experience and wisdom behind them. Monumental change should be made only for compelling reasons and after careful consideration of all foreseeable consequences.
 
 
 6
 Despite the opinion's modest language, the panel here has taken quite an extraordinary step. Simply stated, the panel has held that in raising a pure question of law a party may rely on appeal only on those authorities which it cited to the district court. A court of appeals, in turn, must ignore its own (and the Supreme Court's) controlling case law if it was not cited to the court below. The panel reaches this result by adding a new term to the argot of jurisprudence: "legal facts." The term is as self-contradictory and nonsensical as the doctrine it supports. Because we can ill afford to maintain this precedent as the law of this circuit, I respectfully dissent from the court's refusal to take this case en banc.
 
 
 7
 * The underlying facts are simple: Defendants, all police officers, surrounded Charles Elder's house and ordered him to come out. He did come out and was promptly arrested in front of his house. Elder sued under 42 U.S.C. § 1983, alleging the police violated his Fourth Amendment right to not be arrested in his home without a valid warrant. Defendants moved for summary judgment claiming qualified immunity. To overcome the immunity defense, plaintiff cited a variety of cases to demonstrate that the specific Fourth Amendment right he sued on was clearly established. None of the cases was directly on point, and the district court granted defendants' motion. Unknown to the parties and the district court was United States v. Al-Azzawy, 784 F.2d 890 (9th Cir.1985), cert. denied, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986), which showed that the "principle [on which plaintiff rested his case] was clearly established at the time of Elder's arrest." Elder v. Holloway, 951 F.2d 1112, 1114 (9th Cir.1991) (previous version of this opinion).[1]
 
 
 8
 Whether the right was clearly established at the time of the incident, the majority recognizes, is a "pure question of law." Elder v. Holloway, 975 F.2d 1388, 1392 (9th Cir.1992) (quoting Romero v. Kitsap County, 931 F.2d 624, 627-28 (9th Cir.1991)). It is, of course, well understood that questions of law are reviewed by us de novo, giving no deference to the ruling of the district court. Pierce v. Underwood, 487 U.S. 552, 557, 108 S.Ct. 2541, 2545, 101 L.Ed.2d 490 (1988); Bose Corp. v. Consumers Union, 466 U.S. 485, 501, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984); United States v. Silverman, 861 F.2d 571, 576 (9th Cir.1988) ("Under the de novo standard of review, we do not defer to the lower court's ruling but freely consider the matter anew, as if no decision had been rendered below.").
 
 
 9
 The reason for de novo review of legal questions is obvious enough: We are in a better position than the district court to resolve legal questions. We "are not encumbered, as are trial judges, by the vital, but time-consuming, process of hearing evidence." United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We see many legal issues repeatedly, giving us a greater familiarity with the subject matter. We also have the advantage of sitting in panels where we can deliberate about legal issues. Even the en banc process (which failed us here) lets us talk to each other about issues that the district court must decide alone.
 
 
 10
 When it comes to facts, however, the district court has an institutional advantage. It can observe witnesses, hear their testimony, and see and touch the physical evidence. Our review of questions of fact is therefore very limited. This leaves resolving questions of law--if necessary, by writing opinions that refine, clarify and develop existing legal doctrines--as our principal mission.
 
 
 11
 Given these defined areas of responsibility, the panel's holding is a true anomaly. According to the panel, because the plaintiff in a qualified immunity case has the burden of showing the defendant violated clearly established law, the relevant law on that point becomes a fact--a legal fact--which the plaintiff must prove up in the district court. But there is nothing about qualified immunity that requires or permits treating the law as fact. Facts by their nature are case specific. They must be proven through witnesses or documentary evidence; the proof is subject to skeptical review by the trier of fact who may not accept all that is put in front of him. Law is external to any particular case; it is not subject to evaluation by the trier of fact; it can be raised for the first time on appeal because it need not--cannot--be established by use of percipient witnesses or documentary evidence.
 
 
 12
 Every issue in every case turns on both fact and law; facts outside a legal framework are as irrelevant as abstract legal principles. When we say, for example, that the plaintiff must prove certain facts at trial, we mean he must first establish what the law is and then conform his proof to the applicable legal standard.[2] If the plaintiff misunderstands the law, he may well prove up the wrong set of facts. The failure to get the law right in such a case may then be fatal, not because law is fact, but because a party can't supplement the record on appeal once it discovers that it missed the legal target in the district court. It is quite another matter to say, as the panel does, that even though the facts proved in the district court would be sufficient to defeat a claim of qualified immunity under the existing law, the party might lose because it forgot to cite the correct case below.
 
 
 13
 The panel's misguided ruling shifts the focus of the qualified immunity inquiry from the clarity of the law actually violated by the defendants to the clarity of the law as presented by the plaintiff to the district court. Thus, under the panel's opinion, a government official's conduct is not evaluated under the standard announced by the Supreme Court--the clearly established law at the time the official acted--but on the basis of what case law the plaintiff's lawyer managed to dredge up and cite below. This is a drastic departure from the way questions of law are decided and reviewed in our system, where the adversaries present their versions of the law to the court and the court renders its determination after making an independent assessment of what the law is.
 
 II
 
 14
 We are told that the blind man, when handed the elephant's tail, concluded that the creature looked like a rope. So does the panel err in building a whole theory of qualified immunity law on a paragraph dangling at the end of Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). There the Court stated: "A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." Id. at 197, 104 S.Ct. at 3020 (emphasis added). The panel reads the phrase "by showing" as setting a requirement that the clearly established law be proved as one typically proves fact--the way one would show that the light was red or that the banana peel was dark and gritty. But that is not a plausible reading of the Supreme Court's language. Because the Court has elsewhere made it clear that whether a right is clearly established is a question of law, the term "showing" must be construed as it applies to legal issues. The way a party demonstrates (or shows) that it should prevail in its legal argument is by citation and argument (which are judged only after a court has made an independent examination of the law), not by testimony and documentary proof.
 
 
 15
 Had the Court meant to adopt the rule that legal issues in qualified immunity cases are to be proved as facts, it would surely have used clearer language to explain what it was doing. It would not have adopted a major change like this merely by using the word "showing" and then hoping the lower courts would notice its word choice and make the connection--a connection no court actually made for eight years, until this panel suddenly perceived it. The Court would have also provided some rationale or explanation for adopting such a startling new rule. It certainly would not have adopted it without any discussion at all.
 
 
 16
 A. To understand the significance of the phrase on which the panel relies we must consider it in the context of both the entire Davis opinion and the legal backdrop against which it was placed. I start by noting that Davis never purported to alter the objective test for qualified immunity first announced in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Davis applied the test unchanged, quoting it in full before it went through its qualified immunity analysis. See Davis, 468 U.S. at 191, 104 S.Ct. at 3017 (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). This express restatement of Harlow shows that the concluding paragraph in Davis--a brief epilogue restating the qualified immunity test--meant simply to reassert Harlow, not alter it.[3]
 
 
 17
 Harlow held that government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. This "qualified immunity defense depends upon the 'objective reasonableness of [the defendant official's] conduct as measured by reference to clearly established law.' No other circumstances are relevant...." Davis, 468 U.S. at 191, 104 S.Ct. at 3017 (citation omitted) (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). Two aspects of the Harlow test call into question the panel's reading of Davis.
 
 
 18
 First, Harlow says nothing about the plaintiff having to prove up the law; in fact, it clearly intends that the court make an independent determination of the law: "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether the law was clearly established at the time an action occurred." 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). Thus, Harlow gave the court the responsibility to determine whether the law was clearly established. Neither Harlow nor Davis ever indicated that the plaintiff is obligated to prove up the law or that he waives any authorities not presented to the district court.
 
 
 19
 Second, the panel's rule is inconsistent with the rationale underlying the Harlow test. Harlow shifted the inquiry in qualified immunity cases from the subjective good faith of the government officials to the objective reasonableness of their conduct in light of clearly established law. See id. at 816-17, 102 S.Ct. at 2737-38. The Court settled on this objective test because "[t]he public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts." Id. at 819, 102 S.Ct. at 2738. The line Harlow drew was clear: "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." Id. at 819, 102 S.Ct. at 2738. Essential to this inquiry is that the official's conduct be judged against an objective standard--the law as it actually was, not as the official thought it was, or as the plaintiff proves it to be. Harlow doesn't say that "officials should be made to hesitate" when plaintiff can cite a case that says they should. Rather, the deterrence is supposed to operate whenever officials in fact transgress the actual clear boundaries of the law. Davis did nothing to move the inquiry off this fixed reference point.
 
 
 20
 In misreading Davis, the panel bypasses a far more natural interpretation of the relevant language--an interpretation based on the analysis in the body of the opinion. The precise question faced in Davis--something the panel never mentions--was whether an immunity defense could be defeated on the ground that the official violated state law. The Court answered this question in the negative, but it didn't stop there. Davis went on to hold that the violation of clearly established law relevant to the immunity determination must be the same violation as that on which the plaintiff rests his section 1983 claim. In other words, a plaintiff suing for violation of a specific Fourth Amendment right may only defeat the immunity claim if that very Fourth Amendment right was the clearly established one.
 
 
 21
 With this holding in mind, the meaning of the passage that confuses the panel becomes clear. Consider again the language: "A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." 468 U.S. at 197, 104 S.Ct. at 3021 (emphasis added). The Court is merely restating its holding by emphasizing that to defeat a qualified immunity claim there must be an identity between the sued-on right and the clearly established right. The language was meant to prevent future plaintiffs from trying, as Scherer did, to sue on one right and to overcome the immunity by showing that some other rights were clearly established. This was the whole point of Davis, and the language the panel relies on here merely summarizes this ruling. It is normal practice to restate holdings in conclusions; it is far from normal for a conclusion to make a substantive legal change that is not even considered in the body of the opinion.
 
 
 22
 B. That Davis was not the watershed opinion the panel here reads it to be is evident from the Supreme Court's subsequent qualified immunity decisions. None of these decisions even hint at a requirement that the plaintiff must prove up the law by pleading legal facts. To the contrary, the Court has continued to draw clear distinctions between questions of law and questions of fact.
 
 
 23
 In Mitchell v. Forsyth, 472 U.S. 511, 524-30, 105 S.Ct. 2806, 2814-18, 86 L.Ed.2d 411 (1985), the Court dissected a qualified immunity claim to determine whether a denial of immunity was an appealable order under Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The Court considered the nature of an immunity claim in applying the Cohen requirement that a claim of right must be "separable from, and collateral to, rights asserted" in the underlying action in order to be appealable in an interlocutory appeal. 472 U.S. at 527, 105 S.Ct. at 2816. In holding that an immunity determination was a separate right, the Supreme Court explained the role of an appellate court in reviewing a qualified immunity claim:
 
 
 24
 An appellate court reviewing the denial of defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even decide whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.... To be sure, the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief.... [T]he Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of the Cohen test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue.
 
 
 25
 472 U.S. at 528-29, 105 S.Ct. at 2816-17 (emphasis added). Mitchell makes clear that the court considers "the factual allegations that make up the plaintiff's claim," not the factual allegations plus the limited "universe of statutory or decisional law" presented to the district court. See 975 F.2d at 1392. There is no hint in Mitchell 's formula that a reviewing court should analyze anything other than the allegations of official misconduct-- factual allegations--presented to the district court when determining whether the conduct violated clearly established law.
 
 
 26
 In Siegert v. Gilley, --- U.S. ----, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), despite a three-way split on the merits, the Justices agreed on one point: It was the facts Siegert alleged, not any particular cases he happened to cite--or not cite--in support of his claim, that mattered for purposes of deciding the qualified immunity question. The Justices seemed perfectly willing to use their own resources to determine and explain what the law was. The majority wrote: "The facts alleged by Siegert cannot, in the light of our decision in Paul v. Davis [424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ] be held to state a claim for denial of a constitutional right." Id. --- U.S. at ----, 111 S.Ct. at 1794 (emphasis added). Focusing on the malice element requisite to Siegert's constitutional claim, Justice Kennedy said: "Upon the assertion of a qualified immunity defense the plaintiff must put forward specific, nonconclusory factual allegations which establish malice, or face dismissal.... In my view petitioner did not meet the burden of alleging facts from which malice could be inferred by other than the most conclusory allegations." Id. at ----, 111 S.Ct. at 1795 (emphasis added). The dissent said something very similar: "The majority contends that Siegert has not alleged the violation of any 'right,' 'clearly established' or otherwise. In my view, there can be no doubt that the conduct alleged deprived Siegert of a protected liberty interest and that this right was clearly established at the time Gilley wrote his letter. Siegert's claim, therefore should surmount Gilley's assertion of qualified immunity." Id. at ----, 111 S.Ct. at 1797 (emphasis added) (Marshall, J., dissenting). Not one of the opinions purported to limit its analysis to the cases cited by Siegert to the district court. The phrase "legal facts" appears nowhere in the opinion.
 
 
 27
 Other post-Davis Supreme Court qualified immunity cases follow the same pattern. See, e.g., Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Hunter v. Bryant, --- U.S. ----, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). In none of the Court's qualified immunity analyses is there support for the panel's rule that a section 1983 (or Bivens ) plaintiff loses on appeal if, though his factual allegations show a violation of clearly established law, he did not cite the right case to the district court to prove that the law was clearly established. Of course, in trying to persuade the court, a plaintiff will want to cite precedents that support his claim that the law the defendant violated was clear. But this doesn't mean the district court (or we on appeal) "has no obligation," see 975 F.2d at 1396, to determine on its own "whether [the] law was clearly established at the time [the] action occurred," Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. The court's job is to determine the rights of the parties, not to grade motion papers.
 
 III
 
 28
 In an effort to bring its novel theory into the doctrinal mainstream, the panel points to a variety of rules and practices that, it argues, provide support for its approach. None, in fact, do so.
 
 
 29
 A. The panel offers this revelation: "While most of our qualified immunity opinions make no mention of who came up with the relevant authority, we have in practice looked to the cases cited by the plaintiff." 975 F.2d at 1393. Of course we have. Much of the time the plaintiff does cite all the relevant cases, so referring to the "cases plaintiff cites" is a useful means of pinpointing a successful argument or rejecting an unsuccessful one. Often we refer to the cases cited by the parties to fulfill our duty to render reasoned decisions that assure the litigants their claims have been given careful consideration. Referring to "the cases the plaintiff cites" is a turn of phrase, not a legal doctrine.
 
 
 30
 Never have we felt limited to considering only those cases plaintiff cites. Backlund v. Barnhart, 778 F.2d 1386 (9th Cir.1985)--the panel's own showpiece precedent--is a good example: In Backlund, the court did note that plaintiffs "fail to cite any pertinent authority" to establish a violated right, id. at 1389, but it didn't end its analysis there. Rather, it went on to say: "Nor can [plaintiffs cite any relevant authority], for the following reasons." Id. At that point, the court launched into a full-scale analysis of the relevant point of law, without ever hinting that its inquiry was somehow limited by the authorities cited by the plaintiff. Had the Backlund court felt itself bound by the cases cited by the plaintiff, all this discussion would have been unnecessary.
 
 
 31
 Many other qualified immunity cases explicitly go beyond the "universe of authorities" cited by the plaintiff. See, e.g., Mendoza v. Blodgett, 960 F.2d 1425, 1431 (9th Cir.1992) ("No case ... has been cited to us, nor have we found any....") (emphasis added), petitions for cert. denied, --- U.S. ----, 113 S.Ct. 1027, 122 L.Ed.2d 173 (1993); Maraziti v. First Interstate Bank of California, 953 F.2d 520, 523 (9th Cir.1992) ("Maraziti cites no cases, and we have found none....") (emphasis added); Alexander v. Perrill, 916 F.2d 1392, 1398 (9th Cir.1990) ("a similar issue [was] previously litigated and decided in [the plaintiff's] favor--a case which inexplicably both parties failed to cite in their briefs") (emphasis added). The careful effort in these cases to seek out and consider authorities not cited by the parties is entirely consistent with what I understand to be our role as judges. The panel's ostrich-like insistence that authorities not cited by the plaintiff in the district court may not be considered on appeal is at odds with this body of case law.
 
 
 32
 B. The panel also cites a variety of rules which penalize a party for failing to raise a legal issue before the district court. 975 F.2d at 1394-95 & n. 4. But none of these is actually analogous; none justifies the panel's doctrinal leap.
 
 
 33
 The panel's principal analogy is to the rule that we will not normally reverse because of an incorrect jury instruction where the party claiming error did not object. But the Federal Rules of Civil Procedure expressly deal with the question of how jury instruction may be reviewed on appeal: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.Proc. 51. That the drafters felt it necessary to have a special rule governing this issue suggests that this is the exception from the normal practice. If one could analogize jury instructions to qualified immunity determinations, the analogy would cut against the panel.
 
 
 34
 But the analogy just isn't there. The purpose of Rule 51 is to require timely objections to instructions so the trial judge has a chance to change them before the jury retires to consider its verdict. Without it, a party who fails to object to a defective instruction would get two bites at the apple. If the party gets a favorable verdict despite the bad instruction, it wins; if the verdict is unfavorable, the party still has a shot at a new trial by appealing on the ground that the instruction was defective. Moreover, the cost of an appellate reversal based on faulty jury instructions--a completely new trial--is obviously very high. With motions for summary judgment based on qualified immunity, on the other hand, there is no incentive to sandbag by failing to point out favorable cases, and the costs of a reversal on an appeal from summary judgment are relatively small.
 
 
 35
 Equally unhelpful are the other rules the panel cites as supposed analogies. 975 F.2d at 1395 n. 4. Each deals with a particular eddy away from the procedural mainstream; none supports the rule adopted here. Rule 12(h)(1), for example, is a procedural tripwire designed to ensure that certain key issues are raised at the very earliest stage of the litigation. Like Rule 51, it embodies an exception, and suggests, if anything, that the opposite is the general rule. In any event, the waiver set up by this rule is limited: It applies to certain, largely factual, defenses each of which is listed within the rule itself. Anyone who files an answer and does not list one of these defenses can fairly be deemed to have waived it; it is a far different matter to say that a plaintiff waives every case in F.2d and the U.S. Reports if he does not mention it in an opposition to a summary judgment motion. The remaining three rules--issues not raised by motion for directed verdict cannot be raised on appeal; facts (factual facts, not legal facts) not presented to the district court cannot be raised on appeal; and review of summary judgment is based on the record as it existed at the time the motion was considered--all deal with facts, which are within the peculiar competence of the district courts.
 
 
 36
 For reasons discussed above, see pp. 993-94 supra, there is simply no analogizing questions of law to questions of fact. Calling it legal fact simply can't, by some peculiar alchemy, turn law into fact. Despite several strained attempts, the panel can find no solid analogy that supports a general rule of waiver of a question of law. This should be an important clue that what we have here is a bold departure from sound and established practice.
 
 IV
 
 37
 The panel's novel rule will serve no one well. Ordinarily, the correct legal result does justice between the parties. By requiring us to ignore the controlling legal precedents and to affirm incorrect legal results, the panel's opinion may require us to affirm many unfair outcomes. The chaotic effects of the panel's rule will not be visited solely on plaintiffs. The government frequently cites cases which run against the general weight of authority in order to show that law which appears to be clearly established is actually muddy. Under Elder, if the government fails to cite such a case to the district court, the district court would presumably be free to ignore it, and we would be powerless to reverse the unjust imposition of liability on a government officer.
 
 
 38
 The panel's ruling also puts attorneys in an extremely awkward position. Under established ethical principles, counsel is required to cite to the district court all binding authorities, not only the favorable ones. Model Rules of Professional Conduct, Rule 3.3(a)(3); Model Code of Professional Responsibility, DR 7-106(B)(1). The same is not true as to facts: A lawyer need not introduce evidence that will defeat his client's claim; it may well be malpractice to do so. But what is a lawyer to do with legal facts? If the majority opinion is read literally, it would seem counsel would have the right--or even the duty--to keep to himself any case law (i.e., any legal facts) which help the other side. Encouraging such fraud on our district courts will neither make the job of district judges easier nor heighten the level of professional ethics among lawyers.
 
 
 39
 Finally, the panel's ruling will make it nearly impossible for us to develop a workable body of case law dealing with qualified immunity. Under the panel's opinion, decisions on qualified immunity issues merely represent factual findings based on the "record of authorities" presented to the district court. 975 F.2d at 1394. Every qualified immunity decision will be limited to its particular "facts," a term now defined to include the cited cases. Even if we were to begin the peculiar practice of including in our opinions a list of all the precedents cited to the district court, a given decision would only bind panels reviewing cases in which an identical list of authorities was presented below. Our decisions will no longer say what the clearly established law is, but only whether certain cited cases are sufficient, standing alone, to clearly establish the law. The panel opinion would therefore make it exceedingly difficult, if not impossible, to develop a jurisprudence of what constitutes "clearly established law," and would thereby "Balkaniz[e] the rule of qualified immunity" law--exactly what the Supreme Court wants to avoid. Anderson v. Creighton, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987).
 
 V
 
 40
 The panel's approach, wrong though it be, does have some intuitive appeal. After all, doesn't fairness to the district judge require that we view the case as he did? Who among us has not felt somewhat betrayed when we were reversed based on an argument not fairly presented to us? "Ah," we may have thought, "had they but put the matter that way, I could well have avoided the error."
 
 
 41
 But the judicial process isn't about fairness to judges; it's about fairness to the parties. While we often speak in terms of "fairly" presenting a matter to the district court, see, e.g., Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 328 n. 9 (9th Cir.1980), we do not mean that the court is somehow disadvantaged because a matter was not fairly presented to it. Properly phrased, the question is: Was the matter presented to the district court in a manner fair to the opposing side?
 
 
 42
 When the question not raised below is factual in nature--which usually means, among other things, that it is peculiarly within the province of one of the parties--we generally say it is not fairly raised if not presented to the court that has competence over factual matters. This stems from the institutional need to build a record before judicial review can be exercised on appeal. But with questions of law, we deem the matter fairly raised if the issue is presented to the district court; citation to a particular case has never been seen as part and parcel of fairly raising the issue below. The district court can, after all, find cases not cited by one party, and the opposing party has the obligation to help the court by presenting relevant precedent to it. Punishing one party so severely for its failure to exhaust all potentially relevant authority may well help district court judges get rid of cases, and give a windfall to parties lucky enough to come across a weak adversary, but it is hardly fair. Determining the law is, after all, a shared responsibility to be borne by the court and the litigants. Where the district judge misses a key precedent and therefore renders an erroneous ruling, the consequences of that error should not be visited entirely on one of the parties.
 
 
 43
 Finally, the panel's contrary result is also hard to square with our long-standing rule requiring liberal constructions of pleadings in civil rights cases. See, e.g., Buckey v. County of Los Angeles, 968 F.2d 791, 794 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992); Gobel v. Maricopa County, 867 F.2d 1201, 1203 (9th Cir.1989). Applying an unprecedented rule of strict construction to a category of cases where we have a tradition of going out of our way to reach the merits is the sort of procedural legerdemain that might make sense to those trained in the law, but it does nothing to enhance public confidence in our federal courts.
 
 
 44
 In sum, the panel has lost sight of the fundamental issue in a section 1983 case: whether or not the officials in question have violated the rights of citizens. Qualified immunity diminishes somewhat the remedies afforded by law to the allegedly wronged individual, but the standards for a grant of immunity reflect a careful balancing process that takes great pains to protect the plaintiff's substantive rights. In defining qualified immunities, each rule must be judged both in terms of how well it protects the substantive right conferred by the statute, and of how much breathing room it gives government officials who must make hard decisions while performing discretionary functions. The panel's rule does nothing at all to help government officials discharge their responsibilities; its only effect is to diminish the rights of aggrieved plaintiffs. This is hardly the type of balancing the Court has said we must perform in adjudicating civil rights cases.
 
 CONCLUSION
 
 45
 All those who enter the Supreme Court building are greeted by the words "Equal Justice Under Law." All too often this is only an aspiration. A party's success sometimes depends as much on the skill of his lawyer as on the strength of his case. But the panel here has taken what was heretofore only a necessary evil and elevated it to a rule of law.
 
 
 46
 Because I believe the panel has taken a giant step in the wrong direction in a very important area of the law, and that it is incumbent on us as a court to correct the error, I respectfully dissent from the order rejecting the suggestion for rehearing en banc.
 
 
 47
 REINHARDT, Circuit Judge, with whom Circuit Judge PREGERSON joins, dissenting from the order rejecting the suggestion for rehearing en banc.
 
 
 48
 I join Judge Kozinski's excellent, if understated, dissent, and write separately to emphasize one or two additional points. First and foremost--it is civil rights plaintiffs who once again are the object of hostile and discriminatory treatment by the federal courts. Elder sets forth the rule that, in considering a civil rights plaintiff's challenge to a state official's qualified immunity defense, appellate courts may not consider cases or precedents which the plaintiff failed to cite to the district court. As Judge Kozinski politely suggests, this is a limitation on appellate review previously unknown in the annals of Anglo-Saxon jurisprudence.
 
 
 49
 It remains to be seen whether the same bizarre rule will be applied when defendants fail to cite cases to the district court--but even if it is, it is clear that in the vast majority of instances, civil rights plaintiffs will bear the brunt of the Elder doctrine. First, plaintiffs are obliged by the nature of the principles governing qualified immunity to rely more heavily on case law than are defendants. The primary means open to a plaintiff to demonstrate the clarity of the law violated by a state official, and thus to overcome a qualified immunity defense, is the citation of past cases which have established a given rule or legal principle. Defendants, by contrast, may rely simply on the absence of cases clearly establishing the relevant law. Defendants are therefore far less likely to fall victim to a rule which harshly penalizes the omission of a citation. Second, civil rights plaintiffs are at a substantial disadvantage with respect to legal resources. While civil rights defendants are generally represented by a legal office composed of a large number of state or local government attorneys, the overwhelming majority of civil rights plaintiffs are unable to obtain comparable representation. Few are in a position to hire a prestigious law firm with a raft of partners and associates, and only a small number obtain representation by an organization with a permanent legal staff of any size. Instead, the victims of civil rights violations must generally rely on lawyers who work in small law offices or as sole practitioners. These lawyers are usually overburdened and rarely have access to the resources and facilities available to the average attorney representing corporate or governmental clients. They are consequently more apt to miss a case than are their governmental opponents. In sum, while we do not yet know whether Elder is even formally neutral between civil rights plaintiffs and defendants, it is evident that as a practical matter it is not, and that it is the plaintiffs who will ordinarily fall victim to its inequitable strictures.
 
 
 50
 I emphasize that no other litigant--whether suing for an antitrust, tort, contract, or copyright violation--risks forfeiture of his right to have the controlling law applied to his case simply because he neglects to cite the appropriate precedent in the district court. For all other litigants, and in all other circuits, the law is the law, regardless of the citation of cases below and regardless of the quality of the plaintiff's lawyer; for a Ninth Circuit civil rights plaintiff faced with a qualified immunity defense, however, the law is only controlling if his lawyer brings the particular case to the attention of the district court. Only in a civil rights case and only in our circuit can the failure to cite a particular decision render a federal appellate court powerless to provide a remedy for a blatantly unconstitutional act. Civil rights victims in the Ninth Circuit will thus be doubly victimized: first by a state or local official's violation of their constitutional rights; next when they seek to recover the damages to which they are entitled.
 
 
 51
 In this case, the panel may not invoke the familiar mantra that the result it reaches, however unjust, is ordained by precedent. No court has ever before concluded that decisional law is lex non grata or loi disparu if not cited to the district court, nor has any court ever before recognized the existence of the hybrid entity which the panel oxymoronically labels "legal fact." On the contrary, in at least three cases our court has expressly acknowledged its obligation to look beyond the cases cited by the parties in analyzing qualified immunity issues. See Kozinski, J., dissenting supra at 997. That the panel is itself solely responsible for the establishment of the paradoxical Elder rule is further evident from the fact that the rule was neither proposed nor discussed by the parties in their briefs. The panel's sua sponte invention of a rule which seriously disadvantages civil rights plaintiffs displays a disregard both for precedent and for the rights of the individuals involved.[1]
 
 
 52
 As Judge Kozinski notes, our en banc process is imperfect. In this respect it is no different from other judicial, governmental, or electoral processes. Misfires occur in all walks of life. However, one aspect of the error we commit here is unique. Under our rules, when we decide not to go en banc, the public is prohibited from learning how the court divided over the issue. The public is even prohibited from learning whether a majority of the court voted against en banc review.[2] The secrecy surrounding our en banc procedure is unhealthy. See discussion in Harris v. Vasquez, 949 F.2d 1497, 1539 (9th Cir.1990) (Reinhardt, J., dissenting), cert. denied, --- U.S. ----, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992). As in Harris, and as in all other en banc proceedings, I think the public, the bar, and the district judges would benefit from knowing the breakdown of the actual vote. For reasons I am not free to reveal, I believe that in the case before us disclosure of the vote would be particularly informative. For that reason, I am especially uncomfortable with the application of our secrecy rule; I will, however, comply with its dictates.
 
 
 53
 I can conceive of only one good reason for any of my colleagues to have voted against an en banc hearing in this case: because they believe that Elder can or will be sharply limited, and they therefore find it unworthy of en banc consideration. Elder is certainly susceptible to a future reading that leaves it with little or no significance. The panel only applied its novel rule after expressly stating that doing so would not result in an injustice. See Elder, 975 F.2d at 1396. According to the panel, its holding does no injustice to Elder because consideration of the precedent which Elder failed to cite--U.S. v. Al-Azzawy[3]--would have made no difference to the outcome of his case. The panel said that even considering Al-Azzawy:
 
 
 54
 ... we are hard pressed to say that the law was so clearly established that a reasonable law enforcement officer in Holloway's shoes would understand that what he was doing violated a constitutional right. See Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986) (the court does not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians"), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).
 
 
 55
 Id.
 
 
 56
 In light of the panel's implicit admission that the result in Elder would have been the same with or without the proclamation of its novel rule, it is tempting to dismiss the rule as mere dicta. That may be difficult to do here, however, because the rule appears to constitute the raison d'etre for the opinion. Nevertheless, future panels may well conclude that the Elder rule should not be invoked if doing so would lead to an unjust result--specifically, if its application would cause a civil rights plaintiff who would otherwise prevail to lose his case.[4]
 
 
 57
 Perhaps it is impatience that prevents me from simply awaiting that result. Doing so might well ensure a peaceful, dignified burial for the bizarre Elder rule. However, like Judge Kozinski, I do not believe it is appropriate to let a case which promulgates so glaring an error in so important an area of the law go unchallenged. Rather, I believe that, considering how significantly the Elder decision conflicts with precedent, practice, and our obligation to vindicate constitutional rights, we have a duty to correct the panel's error now. I believe we breach that duty by failing to take the case en banc. Thus, for the reasons I have expressed, and for those ably articulated by Judge Kozinski, I dissent from the order denying en banc review.
 
 
 
 [1]
 The panel omits this statement from the more recent version of its opinion, but it does nothing to controvert it. This is quite understandable. Al-Azzawy is on all fours with this case; our statement that "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home," Al-Azzawy, 784 F.2d at 893, was clear, and it applies directly to the claim of qualified immunity raised by the defendants here. Its applicability is undiminished by the panel's suggestion that it "may be regarded as dicta." Elder, 975 F.2d at 1391. In fact, the majority's reliance on its newly invented doctrine can only be understood as recognizing that Al-Azzawy does make a difference. After all, if Al-Azzawy did not change the legal landscape enough to defeat a claim of qualified immunity, it would have been far simpler to dispose of the case on that basis
 
 
 [2]
 If it turns out that the plaintiff misunderstands the law and, as a consequence, misleads the district court, we may well limit the scope of our judicial review. See pp. 998-99 infra. But we most assuredly do not say that the plaintiff has failed to meet his burden of proof because he did not cite a particular case to the district court; we certainly do not say that the appeal must be determined as if no other law existed than what was cited to the district court
 
 
 [3]
 In fact, Davis clarified Harlow; I take that up below. See p. 995 infra
 
 
 [1]
 There is little comfort that an adherent of constitutional rights can take from Elder. It is worth noting, however, that while the panel attempts to tie our hands, it has not sought to change the district court's traditional role. Even under Elder, district courts knowledgeable in the law will continue to apply the relevant law whether or not it has been cited by the plaintiff. See Elder, 975 F.2d at 1396
 
 
 [2]
 In our circuit, an en banc call can be defeated even when a majority of the court does not vote against an en banc hearing. En banc review occurs only when an absolute majority of active judges votes in the affirmative. Thus, a tie vote will always defeat an en banc call. Similarly, a call will fail if a majority of those voting cast a "yes" vote but the "yes" votes do not outnumber the combined "no" votes and abstentions. See generally Harris v. Vasquez, 949 F.2d at 1539
 I should add that even where, as here, a dissent from an order denying en banc review is filed, the public cannot tell how many judges favored an en banc hearing. Judges who vote in favor of en banc review frequently do not join the dissent.
 
 
 [3]
 784 F.2d 890 (9th Cir.1985), cert. denied, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986)
 
 
 [4]
 Judge Kozinski argues at n. 1 of his dissent that, despite the language of the opinion, Elder cannot be interpreted to hold that the panel would have reached the same result if U.S. v. Al-Azzawy had been cited to the district court. He bases his argument on his own interpretation of Al-Azzawy and on the observation that it would be improper and illogical to invent a completely new legal doctrine in order to avoid considering a non-controlling case. Even if Judge Kozinski is correct that, properly construed, Al-Azzawy would require reversal of the district court, that cannot change the fact that the panel's view of Al-Azzawy was different. It was the panel's view that Al-Azzawy did not clearly establish the law, and it was on the basis of that interpretation of Al-Azzawy that the panel determined to apply its rule, believing that the result would not be affected. Thus, it is the panel's interpretation of Al-Azzawy that we must accept in construing its holding--not Judge Kozinski's. Similarly, that it was improper or illogical for the panel to promulgate a new legal rule under the circumstances present here does not change the fact that the panel did so. We cannot say that because the panel acted illogically or improperly, its opinion does not mean what its language plainly states