Linda N. VOOHRIES–LARSON, surviving mother of Torrence Justin Voohries; Betsy Keilen, surviving mother of Brad Keilen; Charlene Townsend, surviving mother of Ronald Sean Townsend, Plaintiffs–Appellants,

v.

CESSNA AIRCRAFT CO., Defendant–Appellee,

and

Black Corporations; John Does; Jane Does, Defendants.

No. 99–15916.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 2000

Filed Feb. 22, 2001

---

10. Defendants–Appellees' Motion to File Appendix of Unpublished Opinions is DENIED.

708

Bruce E. Meyerson, Sandra K. Sanders, and Anthony J. Blackwell, Steptoe & Johnson, LLP, Phoenix, Arizona, for the plaintiffs-appellants.

Ronald P. Williams and Lynn D. Preheim, Morrison & Hecker, LLP, Wichita, Kansas, for the defendant-appellee.

Before: REINHARDT, BRUNETTI and RYMER, Circuit Judges.

Opinion by Judge BRUNETTI; Dissent by Judge REINHARDT

BRUNETTI, Circuit Judge:

Appellants Linda Voohries–Larson, Betsy Keilen, and Charlene Townsend, the mothers of three individuals killed in the crash of an airplane manufactured by the appellee Cessna Aircraft Company, appeal the judgment entered following a jury verdict for Cessna in their diversity action alleging wrongful death and product liability. Appellants contend that the district court erred in its instructions to the jury regarding superseding cause and wilful and wanton conduct. We have jurisdiction under 28 U.S.C. § 1291, and we dismiss in part and affirm in part.

## I.

On July 4, 1993, a twin-engine Cessna airplane crashed in Prescott, Arizona, killing all five people on board. The three men who died in the crash were subsequently identified as Brad Keilen, Torrence Voohries, and Ronald Townsend, children of the three appellants. The two women on board, Megan Campbell and Stacy Stephenson, met the men the night of the crash and had accepted an offer to ride in the airplane. Because there were no eyewitnesses to the crash, the wreckage and bodies were discovered after five hours had elapsed.

During the course of the sixteen-day trial, the parties presented starkly different theories as to the cause of the crash. The appellants claimed that the crash was caused by a defect or defects in the Cessna airplane, whereas Cessna claimed the accident was solely due to pilot error and negligence. The jury heard from twenty-six witnesses, including ten experts, and had to analyze the relative merits of two competing accident reconstruction theories.

The appellants presented evidence at trial to prove that the type of airplane in which the decedents crashed, a Cessna T–303, is defectively designed and unreasonably dangerous. This evidence included expert testimony that the T–303's fuel tank is constructed in a manner that permits air to enter the fuel lines in some circumstances, causing an unexpected interruption in the flow of fuel to an engine despite the presence of fuel in the tank. When the airplane's rate of turn and angle of bank are not balanced (a condition called "uncoordinated flight"), the construction of the T–303's fuel tank creates a risk not present with other airplanes. If gravity pushed the fuel outboard, as it would during uncoordinated flight, air would be drawn into the fuel system and interrupt the flow of fuel to the engine. According to the appellants' theory, the pilot must have flown in uncoordinated flight for at least one minute and forty seconds, the amount of time sufficient to interrupt the flow of fuel. This interruption would then have caused the pilot to shut down the left engine; this, in turn, caused the plane to experience asymmetrical thrust which eventually began a spin to the left from which the plane could not recover.

The appellants supported their theory with a demonstration by an expert witness, in which he filled a T–303 wing tank with 30 gallons of liquid, set the wing (no longer attached to the aircraft) on two sawhorses, tilted it downward and timed how long it would take for the inboard fuel inlets to unport as the liquid ran downhill. The test was performed with 30 gallons of fuel, although the National Transportation Safety Board found the left wing tank of the accident aircraft contained approximately 38 gallons of fuel at the time of the accident. The demonstration had a force of one G, or the force of gravity, operating on the liquid. Cessna repeatedly challenged the demonstration as not representative of what actually occurred in flight.

On cross-examination, the appellants' expert acknowledged that, not only was flying in uncoordinated flight for the length of time suggested by their demonstration a violation of Federal Aviation Regulations and the Cessna Pilots' Operating Handbook for the T–303, but also such uncoordinated flight resulting in a 1 G force out-

board would cause the passengers and crew to be pressed toward the left side of the airplane and, if seated on the left side, they would be forced against the bulkhead.

Appellants' experts further acknowledged that a stall caused by fuel interruption would only affect one engine and that the T303 was designed and certified by the Federal Aviation Administration (FAA) as capable of being flown on one engine. Voohries and Keilen were required to demonstrate their ability to fly and land the aircraft on one engine in order to obtain the pilot certificates they held. Appellants' experts testified that they knew of no reason why the pilots could not have completed the flight on one engine.

Cessna also presented expert testimony regarding the design of the Cessna airplane. Cessna's expert conducted a test to disprove the uncoordinated flight theory, in which he actually flew the T–303 in uncoordinated flight for the length of time that the decedents were alleged to have flown it that night, to mimic the forces of actual flight. Cameras were mounted inside the fuel tank showing the fuel inlets and on the cockpit instruments indicating the extent of uncoordinated flight. He also used a force gauge to measure the amount of pressure he placed on the right rubber pedal with his leg in order to achieve and maintain uncoordinated flight. The gauge measured approximately 100 pounds, demonstrating to the jury the unreasonableness of flying the aircraft in this manner.

Cessna also presented the testimony of the primary test pilot for the FAA certification of the T–303. The FAA required certain test flights be performed on the T–303 to demonstrate unusable fuel. During these tests, the FAA mandated that the pilot fly the plane in uncoordinated flight to attempt to intentionally uncover the fuel ports in the wing of the plane. In one demonstration, the aircraft was flown in uncoordinated flight for one minute, then coordinated for one minute, then uncoordinated for one minute, and so on until the

first sign of fuel interruption. When fuel interruption occurred, the engine was shut down and the plane returned to the ground on one engine. Then the fuel was measured to determine how much remained. The fuel remaining in the tank. following these tests was .79 gallons, as compared to the 38 gallons in the tank of the airplane at the time of the crash. This evidence demonstrated how extreme the uncoordinated flight would have to have been to unport the fuel inlets with 38 gallons in the tank.

Cessna theorized that the stall was attributable solely to pilot error, due to fatigue and sleep deprivation, alcohol, night flying, the airport environment, failure to wear corrective lenses, and the cockpit circumstances. First, Cessna presented evidence that it could have been either Voohries or Keilen flying the plane, as both men were commercial multi-engine pilots and both had licenses that would allow them to fly a T–303. Although Keilen rented the aircraft and was pilot in command for purposes of FAA regulations, this alone did not mean that Keilen actually piloted the aircraft. The T–303 had dual controls and could be operated from either the left front or right front seats, which were occupied by Keilen and Voohries respectively. Evidence pointed to the possibility that Voohries may have assumed some pilot responsibilities during flight, as one of the horns was broken off on Voohries' yoke, indicating his hand may have been on it at the time of the crash.

Cessna introduced evidence that showed both Keilen and Voohries had consumed alcohol during the evening prior to the accident. One witness, an airport employee, testified that one of the men had a beer in his hand when he deplaned in Prescott that evening. Another witness, who drove the men to the bar in the town of Prescott from the airport, testified that they were drinking alcohol en route. Rosemary Guadiana, a friend of the two women killed in the plane crash who was with them that evening, testified that Keilen had joked about violating the FAA regulation that

712

prohibits consumption of alcohol within eight hours before piloting an aircraft. Postmortem tests revealed traces of alcohol in Keilen's body fluids. The plaintiffs disputed these findings, arguing that other tests performed on other fluids from Mr. Keilen's body yielded negative results for evidence of alcohol use and that the positive results could have been caused by the creation of alcohol by Keilen's body as it began to decompose.

Cessna also introduced evidence at trial to show that Keilen and Voohries may have been suffering from fatigue at the time of the accident, due to a lack of sleep in the days prior to the crash. Two days before the accident, on July 2, 1993, Keilen and Voohries flew to Laughlin, Nevada, and Keilen's girlfriend testified that they did not return home until 2:00 a.m. on Saturday, July 3, 1993. Keilen went to work at 6:00 a.m. that Saturday morning, only four hours later, and worked until 2:00 p.m. At 3:00 p.m., Keilen called a friend who invited him to a party, and Keilen refused, saying he was tired and going to get some sleep. His whereabouts for the remainder of the day were unknown. Approximately eight hours later, Keilen, Voohries, and Townsend left for Prescott and, upon arrival, went immediately to a bar, in which they met the two women who would later die in the plane crash with them. The accident occurred in the early hours of the morning of July 4, as the plane was last located on radar at 3:20 a.m. Therefore, by the time of the accident, both men had very little and irregular sleep in a forty-eight hour period.

Furthermore, Cessna introduced evidence to show that the decedents acted recklessly towards the safety of others, because in spite of the fact that they were fatigued and had consumed alcohol, they cajoled and finally convinced the two women, who were initially reluctant, into going on the perimeter flight with them. After having met at the bar in Prescott at 1 a.m., the men initially invited all three women,

Campbell, Stephenson, and Rosemary Guadiana. Guadiana would refuse to go on the flight and later would be the only survivor and witness to the events of the evening. Guadiana testified that all the women refused the men's initial requests but they were insistent. They made repeated requests that the women go on an airplane ride with them, either to Phoenix or on a perimeter flight around the City of Prescott. According to Guadiana, she was called "Little Ms. Negative" by Voohries, and all the women were referred to as "chicken" when they first refused. Although Campbell and Stephenson eventually agreed to a perimeter flight, Guadiana continued to refuse due to concerns that Keilen was drunk and tired. Her concerns were based on the conduct of Keilen that she observed. She testified that on the drive back to the airport from the bar in Prescott, Keilen stated he was tired and closed his eyes in the course of a conversation with fellow passengers.

Further proof showed that Keilen had difficulty activating the runway lights while in the cabin of the aircraft, which Guadiana noticed when she briefly sat in the airplane before they left on the flight. Guadiana voiced these concerns to Townsend, Keilen's friend, and in her statement written two days following the crash, Guadiana stated that Townsend said in response, "no, he only had a few drinks, he's just really tired." Guadiana attempted to warn her friends, by pulling them aside and telling them it was not safe. She also told them that they "were taking their life into their own hands" by getting on the airplane.

Finally, Cessna introduced evidence that Keilen was not wearing corrective lenses as he was required to do under FAA regulations.

Following seven hours of deliberation, the jury returned a verdict for Cessna. This appeal followed.

## II.

■ The appellants contend that two of the instructions given to the jury were erroneous. The standard of review on appeal for an alleged error in jury instructions depends on the nature of the claimed error. *See Oglesby v. Southern Pac. Transp. Co.,* 6 F.3d 603, 606 (9th Cir.1993). If jury instructions are challenged as a misstatement of the law, they are reviewed de novo. *See Mockler v. Multnomah County,* 140 F.3d 808, 812 (9th Cir.1998). Otherwise, a district court is afforded "substantial latitude in tailoring jury instructions, [and] we review the formulation of those instructions for abuse of discretion." *See Gilbrook v. City of Westminster,* 177 F.3d 839, 860 (9th Cir.1999).

### A.

First, the appellants assert that the superseding cause instruction given by the district court was an incorrect statement of law because a plaintiff's negligence can never be a superseding cause under Arizona law, and therefore giving the instruction violated Article 18, section 5 of the Arizona Constitution. That section provides: "The defense of contributory negligence ... shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury." Furthermore, the appellants argue that the instruction deprived them of their statutory right to have the jury allocate fault between Cessna and the decedents, if appropriate, under the doctrine of comparative fault as stated in section 12–2505(A) of the Arizona Code.

The superseding cause instruction given provided:

Cessna claims that the actions of Plaintiffs' decedents constituted a superseding cause. A superseding cause is one which is unforeseeable and may be described as abnormal or extraordinary. If you find the actions of Plaintiffs' decedents constituted a superseding cause, you must find for Defendant Cessna. The intervening negligence of Plaintiffs' decedents is not a superseding cause if the Defendant's conduct was a substantial factor in bringing about the result and if a reasonable person knowing the situation existing when the act of the Plaintiffs' decedents was done would not regard it as highly extraordinary that the Plaintiffs' decedents had so acted.

As a preliminary matter, Cessna argues that the appellants are precluded from raising these issues on appeal because they failed to object properly at trial. Cessna contends that the appellants were given ample opportunity to object on these statutory and constitutional grounds during trial but instead only objected on the grounds that the instruction as given was an incomplete statement of the law and that Cessna had presented insufficient evidence that the decedents' actions were unforeseeable.

■ Federal Rule of Civil Procedure 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." In *Palmer v. Hoffman,* 318 U.S. 109, 119, 63 S.Ct. 477, 87 L.Ed. 645 (1943), the Supreme Court stated that "objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error." The purpose of Rule 51, and the requirement of specificity in the objection, is to "bring possible errors to light while there is still time to correct them without entailing the cost, delay and expenditure of judicial resources occasioned by retrials." *See Bertrand v. Southern Pac. Co.,* 282 F.2d 569, 572 (9th Cir.1960).

■ This court has long enjoyed the "reputation as the strictest enforcer of Rule 51," as we have consistently declared that there is no "plain error" exception in civil cases in this circuit. *See Hammer v. Gross,* 932 F.2d 842, 847 (9th Cir.1991); *see also* 9 Charles Alan Wright & Arthur

R. Miller, Federal Practice and Procedure: Civil 2d § 2558, at 468 (1994) ("[T]he Ninth and Seventh Circuits stand alone in reading Civil Rule 51 literally.")

■ Therefore, to satisfy Rule 51, the appellants must have objected at the time of trial on grounds that were sufficiently precise to alert the district court not only that the instruction was defective, but that it was defective based on the Arizona Constitution and an Arizona statute. However, a review of the record reveals that, despite repeated opportunities to develop these specific grounds on which they now object, the objections presented by the appellants in both oral argument and written memoranda related only to the sufficiency of the evidence and its alleged incomplete statement of the law. These objections do not satisfy Rule 51.

First, in two separate memoranda to the district court, the appellants objected on the grounds that "there is no evidence whatsoever to suggest the superseding cause which was unforeseeable." During a hearing on jury instructions, they noted their objection to the instruction in the following terms:

> Just so our objection's clear, Your Honor, in addition to what we stated it's our position that it is a—that any statement given to this jury would be an incomplete statement and not comprehensible to a lay jury, A. B, there is absolutely no evidence that whatever happened here can be even remotely regarded as abnormal or extraordinary. The defense is attempting to take a fault issue and coin it in causation terms, and there is absolutely no evidence that whatever Hall described as the defect was somehow broken by abnormal or extraordinary cause.... This there is no evidence that the cause—any evidence to support an unforeseeable, abnormal, or extraordinary cause in this case. [ER W at 106–07]

The appellants rely heavily on the statement that "[t]he defense is attempting to take a fault issue and coin it in causation terms" as an adequate expression of the constitutional grounds they now argue on appeal. However, the appellants' argument on appeal is that the instruction erroneously equates superseding cause and contributory negligence, thereby requiring the jury to bar the plaintiff's recovery if they concluded that the plaintiff's negligence was a superseding cause. They argue that this mandatory language deprived the jury of their right under the Arizona Constitution to choose whether or not to apply contributory negligence in any factual scenario. Although the statement made by appellants' counsel during the hearing on instructions does relate to the interaction between fault and causation under Arizona law, it simply does not "bring into focus the precise nature of the alleged error" as being a violation of Article 18, section 5 of the Arizona Constitution. Instead, if the appellants were actually referencing a constitutional objection with that single comment, they spoke at a level of generality that Rule 51 does not allow. Indeed, when placed in context, the statement merely echoed their previously voiced concerns, that the evidence was insufficient to support a superseding cause instruction and that the jury would be confused by this instruction in isolation.

■■ Finally, we consider whether the appellants' objections, although deficient in terms of the plain language of Rule 51, fall within the limited exception we have recognized for a pointless formality. *See, e.g., Gulliford v. Pierce County,* 136 F.3d 1345, 1348–49 (9th Cir.1998); *McGonigle v. Combs,* 968 F.2d 810, 823 (9th Cir.1992). "Where the district court is aware of the party's concerns with an instruction, and further objection would be unavailing, we will not require a futile formal objection." *Gulliford,* 136 F.3d at 1348 (citation and internal quotation marks omitted). We have held that an objection is a pointless formality " 'when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record

that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction." *Glover v. BIC Corp.*, 6 F.3d 1318, 1326 (9th Cir.1993) (citation omitted).

Here, as stated above, the record reveals that the district court did not know the specific constitutional and statutory grounds on which the appellants now object. They did not put the court on notice by offering alternative instructions that were denied, unlike the parties in *McGonigle, Gulliford,* and *Glover.* In fact, they never offered this argument to the court in any form. The appellants argue that they did not and could not offer alternative instructions because they simply wanted no instruction on superseding cause at all. However, even if this is true, it does not end our inquiry. The requirement of alternative instructions recognized in our previous cases is merely a means to an end, as a demonstration that the party who opposed the jury instruction had argued this matter in front of the court in some form other than a formal objection and that any more objections on these grounds would be futile. The appellants could have argued the grounds they now offer on appeal in pretrial briefs, a motion for a directed verdict or a witness examination; however, they did not.

The pointless formality exception exists to stop the meaningless elevation of form over substance when applying Rule 51. However, here, the substance of the objection never saw the light of day. Since the district court was never alerted to the exact nature of the disagreement, it certainly would not have been futile for the appellants to bring the matter to its attention.

Because the appellants failed to preserve their objection at the time of trial, we accordingly decline to entertain their challenge to the district court's superseding cause instruction.

**B.**

The appellants also assert that the wilful and wanton conduct instruction given by the district court was erroneous. The jury instruction provided:

I will now instruct you about wilful or wanton conduct. This type of fault involves more than negligence. Where wilful or wanton conduct causes an injury, rules of law apply that are different from the rules we have previously discussed.

Wilful and wanton conduct is action or inaction with reckless indifference to the results, or to the rights or safety of others. A person is recklessly indifferent if he knows or a reasonable person in his position ought to know:

(1) That his action or inaction creates an unreasonable risk of harm; and

(2) The risk is so great that it is highly probable that harm will result.

If you find that Plaintiffs' decedents, Brad Keilen and/or Torrence Voohries, wilfully or wantonly caused the accident and that defendant was at fault, then you may, in your discretion, either find for the Plaintiffs and award full damages or find for the Defendant and award no damages; you are not to determine relative degrees of fault.

The appellants contend that the instruction deprived them of their right to comparative fault allocation, because the wording "and/or" indicated that a finding of wilful or wanton conduct by one decedent barred recovery by all the others. They argue that this mandatory charge to the jury is in conflict with two provisions of Arizona law. Section 12–2505 of the Arizona Code states that "[t]here is no right to comparative negligence in favor of any claimant who has intentionally, wilfully, or wantonly caused or contributed to the injury or wrongful death" and that "'claimant's fault' includes the fault imputed or attributed to a claimant by operation of law, if any." Under section 12–2506, Arizona abolished joint liability or imputed

negligence for wilful and wanton conduct. Therefore, because there is no imputed negligence for wilful or wanton conduct by operation of law, the general provision barring the application of comparative negligence to a claimant who has acted wilfully or wantonly should apply only as to that decedent who is actually found by the jury to have engaged in wilful or wanton conduct.

Again, as a preliminary matter, we must determine whether the appellants satisfied Rule 51. Here, as the appellants conceded, they did not object to the wilful and wanton conduct instruction as a misstatement of law at any time during trial. Nonetheless, they argue that this issue should be heard on appeal, because this Court permits review when the issue in question was "central to the trial [and] justice requires review." *See Murphy v. City of Long Beach*, 914 F.2d 183, 187 n. 7 (9th Cir.1990); *Pierce v. Southern Pac. Transp. Co.*, 823 F.2d 1366, 1371–72 (9th Cir.1987); *Brown v. AVEMCO Inv. Corp.*, 603 F.2d 1367, 1374–75 (9th Cir.1979).

A review of the cases on which the appellants rely reveals the flimsy foundation for this purported exception. Not only does this language appear primarily in dicta, but the very case from which it appears to be derived simply does not stand for the proposition for which it has since been cited. *See Brown*, 603 F.2d at 1374–75. The growth of this exception is based upon a misreading of *Brown*, resulting in a phrase taken completely out of context from that opinion. There, we held that the appellant *had* actually complied with Rule 51 because appellant's counsel had requested instructions, the district court heard extensive arguments regarding those instructions, viewed and rejected them, and "all parties knew from what had proceeded that the court did not unknowingly or hastily" give the instruction. *Id.* at 1373.

The *Brown* opinion goes on to ⋅ discuss the history of Ninth Circuit cases involving the failure to give requested instructions.

In that historical discussion, a crucial distinction is drawn between cases in which the appellant does not object but requests alternative instructions (where this court will occasionally find compliance with Rule 51) and cases in which "appellant failed to object at trial to allegedly erroneous or deficient instructions but there is no indication in the appellate opinion that appellant had requested the trial court to give any alternative instructions" (where this court will not find compliance). *Id.* In pointing out this difference, the *Brown* court's holding relies on the solid conceptual underpinnings of the pointless formality exception to Rule 51's requirements: if counsel introduces an instruction and presents arguments to the district court concerning the merits of that instruction, then there is often no need for a formal objection. However, the *Brown* court emphasized that there is indeed a substantive difference between that situation and the one presented here in which counsel presents no alternative instructions and also makes no objection to the instruction that opposing counsel introduces. In fact, the court relied upon that very distinction in finding that the appellant had satisfied Rule 51. Therefore, the holding of this case does not in any way extend to an appellant who has made no objection at trial and requested no alternative instruction.

In dicta, the majority opinion of *Brown* does cite a line of cases in the Ninth Circuit where "this court found technical noncompliance with Rule 51 but proceeded to evaluate the merits of the appeal." *Id.* at 1374–75. Again, a review of these cases does not strengthen the proposition that a broad exception exists for issues "central to trial and where justice requires review." Instead, the cases reveal two strands of "technical noncompliance," both of which are limited in scope and inapplicable here. *See id.* at 1374–5, 1375 n. 4.

First, the opinion cites *Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709 (9th Cir.1959), as an example where "this court

found that appellant had no right to review of the issue but justice required such review." *Brown,* 603 F.2d at 1375. It is true that we held in *Richfield* that appellant's "objection to the court's instructions is not available to it on this appeal[, b]ut we have nevertheless considered the question as to whether giving the instruction was error." 271 F.2d at 722. However, there again, appellant previously had discussed the alleged problem in the instructions with the district court, and "Richfield knew the court's position and the court knew counsel's position." *Id.* The *Richfield* court stated that "we might hazard a guess that it would have been a difficult task, even by stating distinctly the grounds of the objection, to have caused the court to change its previously announced position." *Id.* Even if we did find "technical noncompliance" in *Richfield,* it seems that this decision was based upon the fact that appellant had already made known his objection to the court. This type of "technical noncompliance" is exactly what we have previously recognized as the "pointless formality" exception.

Second, the *Brown* court relies upon cases from this court in which we found that the appellant did not satisfy the requirements of Rule 51 and therefore waived his *right* to appeal, but went on to "observe in passing" that there was no error in the instructions anyway. *Shevlin–Hixon Co. v. Smith,* 165 F.2d 170 (9th Cir.1947); *see also Wellman v. Jellison,* 593 F.2d 876 (9th Cir.1979)(reviewing the instructions as a whole and finding no basis for reversal); *Moore v. Telfon Communications Corp.,* 589 F.2d 959, 966 (9th Cir.1978); *Johnston v. Pierce Packing Co.,* 550 F.2d 474, 479 (9th Cir.1977); *Southern*

*Pacific Co. v. Villarruel,* 307 F.2d 414, 415 (9th Cir.1962); *Williams v. Union Pacific Railroad,* 286 F.2d 50, 54 (9th Cir.1960); *Hargrave v. Wellman,* 276 F.2d 948, 950–51 (9th Cir.1960); *Koch v. United States,* 264 F.2d 334, 338 (9th Cir.1958); *Lloy v. Pacific Electric Ry. Co.,* 207 F.2d 662, 665 (9th Cir.1953).[1] These cases do not in any way carve out an exception to the requirements of Rule 51, as they all emphatically hold that the appellant waived his appeal by right. Instead, they merely contain dicta in which we state that, if the appellant had preserved his objection, it would not have warranted reversal.

After this historical summary of the Rule 51 cases in this circuit, the *Brown* opinion uses the language now at issue here, stating that "even if there were not compliance with Rule 51 in this case, review would be appropriate [because] [t]he issue was central to the trial and justice requires review of the treatment of that issue in the instructions as a whole." *See* 603 F.2d at 1375. However, all that can be extrapolated from this dicta and the historical analysis that precedes it is that we will occasionally look beyond the technical requirements of Rule 51 when appellant has actually presented the precise argument being argued on appeal to the district court, albeit in a different form. We cannot read into the holding (or even the dicta) of *Brown* an exception which allows this court to engage in a wide-ranging, subjective inquiry concerning whether the issue contained in the instructions is "central to the trial" and whether "justice requires a review" every time an appellant has not preserved his objection at trial.

After *Brown,* only our holding in *Pierce* has directly relied on this exception.[2]

---

1. The only case cited in footnote 4 of *Brown* which actually reviews and finds error in a jury instruction did not hold that Rule 51 was not satisfied. *See Granite Music Corp. v. United Artists Corp.,* 532 F.2d 718, 721–22 (9th Cir.1976). Instead, we merely stated that "we seriously question whether plaintiff preserved his record by specifically objecting to the instruction given and setting forth the

terms of what he thought the instruction should have been." *Id.*

2. Again, in *Murphy v. City of Long Beach,* compliance with Rule 51 was not at issue. Instead, we were considering whether a district court could grant a new trial sua sponte on the grounds that errors in the instructions resulted in a miscarriage of justice, despite the party's failure to object. *See* 914 F.2d at

There, we did analyze the purported error in the instructions despite the party's failure to object and in the absence of any alternative instruction or other argument, and the sole grounds for review was this exception. *See Pierce,* 823 F.2d 1366, 1371–72. The error was a failure to include an instruction, and we held that the jury essentially analyzed the issue addressed by the instruction under another theory and that "the result in [the] case would be the same" anyway. *See id.* at 1372.

Even if our holding in *Pierce* can be read to endorse a general exception to Rule 51 for issues central to trial where justice requires review, it does not apply here. In *Pierce,* the court did not give any instruction at all on the issue of immunity from liability, whereas here the district court gave multiple instructions regarding causation and contributory negligence. If *Pierce* is read broadly to apply this exception whenever a jury instruction is given concerning an important issue that allegedly misstates the law yet counsel fails to object, the exception would begin to swallow Rule 51. There would be no practical difference between this exception and the plain error rule which we have consistently rejected. To avoid this incongruous result, *Pierce* should be limited to cases in which a court fails entirely to give an instruction on an issue central to the trial and where it is possible that the issue in question was not considered at all by the jury. In that way, *Pierce* would be faithful to the real, limited roots of this purported exception. Here, the district court did give an instruction on wilful and wanton conduct, and therefore the exception in *Pierce* should not apply.

We find ·that the appellants failed to preserve this objection regarding the wilful and wanton conduct instruction for appeal.

187. It is only in dicta that we commented that "even if Rule 51 were applicable in this case, the ... issues were 'central to the trial

## C.

Finally, appellants object to the wilful and wanton conduct instruction on the alternative grounds that the evidence presented was insufficient to support the instruction given. This objection was preserved for appeal, as the appellants objected on exactly these grounds on two separate occasions. First, in a written memoranda, they objected to this instruction arguing that "there is no factual basis for the allegation that wilful or wanton conduct is appropriate . in this case." Then, at a later conference, they reiterated the objection that "there simply is no evidence from which to support an instruction of wilful and wanton." These assertions distinctly state the matter to which they object, as well as the grounds for objection.

Appellants assert that the decedents' conduct as proven at trial did not rise to the level that would warrant giving a wilful and wanton conduct instruction. They argue that Arizona courts will only give this instruction "where conduct meriting such an instruction is shown. Slight and inconclusive evidence is not enough." *Williams v. Wise,* 106 Ariz. 335, 340, 476 P.2d 145 (1970). In *Williams,* the Arizona Supreme Court equated wanton negligence with criminal or quasi-criminal conduct. *See id.* at 341, 476 P.2d 145.

However, the focus on the standard under Arizona law is misguided. In *Seltzer v. Chesley,* 512 F.2d 1030, 1035 (9th Cir.1975), we held that, under the Erie doctrine, "federal procedural rules and law control the manner and method of instructing the jury in federal courts." Therefore, the federal standard, not the Arizona standard, should govern the issue of whether sufficient evidence existed to warrant the wilful or wanton conduct instruction: "A defendant is entitled to have the judge instruct the jury on his theory of

and justice requires review of the treatment of these issues in the instructions as a whole.' " *See id.* at 187 n. 7.

defense provided that it is supported by the law and *some evidence.*" *United States v. Mason,* 902 F.2d 1434, 1438 (9th Cir.1990)(emphasis added).

Here, there is ample circumstantial evidence to warrant the instruction. The combination of the consumption of alcohol, fatigue, the disregard of FAA regulations and the apparent insistence that the women join them despite the risks involved, support the conclusion that at least one of the decedents acted with reckless indifference towards the safety of others, including Megan Campbell and Stacy Stephenson.

The appellants concede that there was evidence presented at trial that Keilen was seen shortly after arriving in the Prescott airport holding a beverage can which could have contained beer, that all three men were drinking beer on the drive in to Prescott, and that they had spent the evening at a bar. In addition, testimony revealed that Keilen was aware that he would be breaking the "bottle to throttle" FAA regulation. Although testimony also revealed that Keilen did not drink any alcohol the two hours before the flight and that he never appeared under the influence of alcohol, the mere fact that Keilen had been drinking at all that evening and that he knew his actions were in violation of FAA regulations demonstrates a reckless indifference to his safety and the safety of others.

Moreover, evidence was also introduced at the trial showing that Keilen and Voohries were suffering from fatigue at the time of the accident, due to their schedule in the days prior to the crash. Although it is conceivable that Keilen napped during the eight hour time span before their departure for Prescott in which his whereabouts are unknown, it is also possible that he did not nap during that time and therefore had only slept for a total of four hours in the forty-eight hour period before the accident. Even if Keilen had napped during the day, he had minimal sleep the night before the accident and, by the time of the plane crash, had been awake for almost the entire next night.

Rosemary Guadiana's testimony about her interactions with the decedents is particularly significant, as she was the only person to see the decedents in the hours preceding the accident. She testified that the men made repeated requests that the women go on a flight with them and called them "chicken" for their initial refusal. When the other two women decided to go, Guadiana continued to refuse and warned the women not to fly with the men.

Viewed in total, this evidence shows that Keilen may have knowingly taken the risk of flying a plane in an exhausted and alcohol-influenced state, thereby putting the passengers' lives in danger. Such conduct could qualify as "action with reckless indifference to the rights and safety of [Megan Campbell and Stacy Stephenson]," thus satisfying the definition of "wilful and wanton" as provided in the jury instruction.

This evidence regarding the decedents is sufficient to warrant giving the instruction to the jury, so that they could at least consider wilful or wanton conduct. The district court did not abuse its discretion, and we affirm.

**DISMISSED IN PART and AFFIRMED IN PART.**

Costs in this appeal are awarded to appellee, Cessna Aircraft.

REINHARDT, Circuit Judge, dissenting:

I respectfully dissent. Arizona law explicitly forbids summary adjudication of contributory negligence. Ariz. Const. art. XVIII, § 5. Cessna attempted to sidestep this prohibition by characterizing decedents' negligence as a superseding cause, in the instruction it submitted to the district court: "[i]f you find the actions of Plaintiffs' decedents constituted a superseding cause, you *must* find for Defendant Cessna" (emphasis added). By giving this instruction, the district court

erroneously allowed the jury to disregard the issue of contributory negligence, over the plaintiffs' objection, and in violation of Arizona law.

In Arizona, "[t]he defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury." *Id.* As the majority notes, the plaintiffs' argument is that Cessna's instruction erroneously equates superseding cause with contributory negligence in an attempt to remove the contributory negligence issue from the jury. *Cf. Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 706 P.2d 364, 371 (1985) (in bank) ("A contributory negligence issue cannot be taken from the jury by the simple expedient of calling it an issue of causation"). Recharacterizing contributory negligence under a different legal heading in an attempt to remove the issue from the jury appears to be a tried and tested ploy in Arizona. *See City of Phoenix v. Schroeder,* 1 Ariz.App. 510, 405 P.2d 301, 308 (1965) ("In this jurisdiction where, by constitutional provision, all question of contributory negligence must be submitted to the jury, it is not surprising that counsel will exert strong pressure upon the courts to recognize other doctrines and apply them in what are logically and legally contributory negligence questions.").

There is no doubt that the district court committed serious prejudicial error in this case, and that as a result the mothers of the three deceased young men were deprived of a fair jury verdict. The majority, however, seizes on a self-created technicality to forfeit the plaintiffs' right to a new trial. My colleagues contend that although the three mothers objected repeatedly and vehemently to the unlawful jury instructions, they failed to specify the applicable Arizona constitutional provision or to make their rationale sufficiently clear

for the district judge. This elevates to even greater heights than in the past the concept of law as an intellectual chess game unrelated to the pursuit of truth or justice. Forgotten in this abstract and heartless form of jurisprudence are the litigants, and the tragedies that families have suffered. Although we may be one of only two circuits that read Rule 51 literally, *see* maj. op. at 713, we need not read it so unreasonably. To hold that plaintiffs may not recover for the death of their children because, although they correctly advised the court that a critical jury instruction was contrary to Arizona law, they failed to mention the specific provision, is not consistent with the language, purpose, or intent of Federal Rule of Civil Procedure 51.

This circuit's "literal" reading of Rule 51, relied on by the majority, provides, at most, that we do not, with two exceptions, permit appellate review simply because of "plain error" in giving the jury instructions. *Hammer v. Gross,* 932 F.2d 842, 847 (9th Cir.1991). The two exceptions are the "pointless formality" exception, *id.,* and the "interests of justice" exception; under those two exceptions, an issue raised for the first time on appeal must be central to the case. *Pierce v. Southern Pac. Transp. Co.,* 823 F.2d 1366, 1371 (9th Cir. 1987). The literal reading of the rule, with its exceptions, is applicable, however, only when the parties fail to object to the instruction before the trial court *at all*[1]— and that is not the circumstance here. In this case, the plaintiffs do not ask us to find "plain error" because they failed to raise an objection, nor do they argue that raising an objection would have been pointless; nor is their point that the issue is so central to the case that, notwithstanding their failure to object, the giving of the erroneous instruction resulted in a mani-

---

1. Under the pointless formality exception, the party alerts the court to the substance of the dispute and the party offers an alternative instruction but *does not object. See, e.g.* Glover v. BIC Corp., 6 F.3d 1318, 1326 (9th Cir.

1993) (finding that the party "neither objected to the alleged insufficiency of the ... instruction during the court's review of the instructions with counsel, nor raised an objection after the charge was read to the jury.").

fest injustice. To the contrary, the plaintiffs did object to the "superseding cause" jury instructions, and they did so at every opportunity: indeed, they could hardly have questioned the jury instruction more often than they did during the course of the trial. They objected in writing on May 19, 1998 and again on February 19, 1999. They objected orally during the hearing on the proposed jury instructions. To find that a properly made, although imprecise, objection does not comport with Rule 51 is not to apply that rule "literally:" it is to expand it substantially, with the result that even properly made objections are excluded from appellate review.

Plaintiffs' objection, that "[t]he defense is attempting to take a fault issue and coin it in causation terms," is more than sufficient to satisfy the requirements of Federal Rule of Civil Procedure 51. Rule 51 requires that a party state the grounds of its objection to a proposed jury instruction. *See* Fed. R. Civ. Proc. 51. "When justice requires," the court need not insist upon "technical," *Southern Pac. Transp. Co.*, 823 F.2d at 1371, or "rote" compliance with Rule 51, but may instead require only "functional" compliance with the Rule. *Biundo v. Old Equity Life Ins. Co.*, 662 F.2d 1297, 1300 (9th Cir.1981). Here, the plaintiffs actually complied; they alerted the court to Cessna's erroneous conflation (in contravention of the Arizona constitution) of superseding cause with contributory negligence. The district court was therefore adequately appraised of the grounds of Cessna's objection.

To conclude, as does the majority, that the plaintiffs failed to object properly because the district court was not told "the specific constitutional and statutory grounds on which the appellants now object," and that it was not "alerted to the exact nature of the disagreement," is, quite simply, to "exalt form over substance with injustice to plaintiffs." *Brown v. AVEMCO Inv. Corp.*, 603 F.2d 1367, 1371 (9th Cir.1979). This extreme literalism frustrates the purpose of the rule, which "is 'to enable the trial judge to avoid error by affording him an opportunity to correct statements and avoid omissions in his charge before the cause has been decided by the jury.'" *Biundo*, 662 F.2d at 1300 (quoting *Investment Service Co. v. Allied Equities Corp.*, 519 F.2d 508, 510 (9th Cir.1975)). Here, the plaintiffs did not attempt to "sandbag" the trial judge by failing to object to a bad instruction as insurance against an adverse verdict. *See Elder v. Holloway*, 984 F.2d 991, 998 (9th Cir.1993) (Kozinski, Circuit Judge, dissenting) (purpose of Rule 51 is to preclude parties "sandbagging" trial judge to get "two bites at the apple"), *reversed by* 510 U.S. 510, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Instead, counsel raised a valid objection that, "though not a model of clarity," *Biundo*, 662 F.2d at 1300, should have alerted the district court to the grounds for the objection.

Rule 51 does not require that plaintiffs' rights be forfeited for a failure to cite the "exact," "specific" constitutional provision, as the majority suggests. My colleagues cite no case imposing so harsh a requirement. In my view, the Rule's purpose is not to deprive a party of its rights but to make sure that, before the jury retires, an objection is made and the trial judge has an opportunity to rule on it. Because I conclude that the plaintiffs properly and repeatedly raised their objection to Cessna's superseding-cause instruction, I would reverse. I, therefore, need not reach any alternative ground for decision.

I note, however, that in its discussion of Cessna's "wilful and wanton" instruction, the majority appears to attempt to overturn our rule establishing an exception to Rule 51, where the issue is central to the case and the interests of justice require review of the jury instruction. *See Brown*, 603 F.2d at 1374–75. The majority's suggested decision is unwise in this respect also. *Brown* and the cases that follow it cannot properly be dismissed as mere dicta. Ultimately, the majority is forced to recognize that the *Brown* exception has

been reiterated in at least one case that binds this court: *Pierce.* Thus the *Brown* exception survives, even if the majority might now rename it the *Pierce* exception. The standard articulated in *Pierce,* 823 F.2d at 1371, does not, to employ the majority's hoary cliche, "swallow the rule;" it undergirds it.

Because the majority's opinion misperceives the purpose and function of Rule 51 and this circuit's precedent regarding its implementation, I respectfully dissent.