158 F.3d 1051
 41 Fed.R.Serv.3d 1524, 98 Cal. Daily Op. Serv. 7983,
98 Daily Journal D.A.R. 11,091
 VALLEY ENGINEERS INC.; Nugget Hydroelectric, L.P., Plaintiffs,
v.
ELECTRIC ENGINEERING COMPANY,
Defendant-Counter-Claimant-Cross-Claimant-Appellant,
Credit Suisse, a Swiss Corporation,
Counter-Defendant-Counter-Claimant-Appellee,
Bruce Brown; Calpine Corporation; William B. Betchart,
Counter-Defendants-Appellees,
and
AMERICAN HOME INSURANCE COMPANY, Counter-Defendant,
v.
ENERVEST CORPORATION, a Colorado Corporation; Enervest
Management Corporation, a Colorado Corporation,
Third-Party-Defendants-Appellees.
 No. 97-16383.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 10, 1998.
Decided Oct. 26, 1998.
 
 Diane Wallis Huijgen, Huijgen & Associates, Union City, CA, for appellant Electric Engineering Company.
 Mark Pomeranz, Pomeranz & Landsman, North Miami, FL, for appellant Electric Engineering Company.
 Kenneth M. Fitzgerald, Latham & Watkins, San Diego, CA, for appellees Credit Suisse and Bruce Brown.
 Chris Gibson, Boutin, Dentino, Gibson & Di Giusto, Sacramento, CA, for appellees Calpine and Will B. Betchart.
 Steven N. Yermish, Paoli, PA, for appellees Enervest Corporation & Enervest Management Corporation.
 Appeal from the United States District Court for the Eastern District of California; Edward J. Garcia, District Judge Presiding. D.C. No. CV-91-00008-EJG.
 Before: WALLACE, T.G. NELSON, and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 This case concerns sanctions for discovery violations.
 
 
 2
 Jurisdiction and Standards of Review.
 
 
 3
 We have jurisdiction over this timely filed appeal pursuant to 28 U.S.C. § 1291. A dismissal under Fed.R.Civ.P. 37 is reviewed for abuse of discretion. Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir.1995). The district court's factual findings are reviewed for clear error. Id.
 
 
 4
 Facts.
 
 
 5
 Nugget Hydroelectric hired Electric Engineering to build four small hydroelectric projects for $11 million. Because construction was going badly, the scope of the contract was reduced from four projects to one. The contract price on the remaining project, Deadwood Creek, was raised from $2 million to $2.5 million. The contract was a turn-key deal, requiring that Electric Engineering get all required permits and easements, and take full responsibility for design, not relying on Nugget Hydroelectric. Electric Engineering did not build the project as promised, and was fired when it missed its deadlines. Electric Engineering's president knew when Electric Engineering agreed to the revised Deadwood Creek contract that Electric Engineering was not going to perform as promised.
 
 
 6
 Just before the revised agreement was signed, Electric Engineering's project manager for the Deadwood Creek project, John Carroll, wrote to the company president, cross-copying the company's lawyers, the memorandum critical to this case. The importance of the memorandum is apparent from its face:
 
 
 7
 I have agonized over the available evidence for the entire weekend and have made several false starts of this letter.
 
 
 8
 ...
 
 
 9
 Deadwood appears to be priced with the same unit prices [as Big Mosquito, one of the three deleted projects]. I do not know the justification for using the same unit prices for Deadwood as Big Mosquito. It is impossible to build the job for the bid prices. The installation of the penstock could cost two or three times the bid amount....
 
 
 10
 The two inlets for Deadwood are located in incredibly difficult terrain, several thousand feet from the nearest dirt road access.
 
 
 11
 ...
 
 
 12
 Nine thousand feet of Deadwood penstock must be delivered several thousand feet down a 1:1 slope and then delivered horizontally to its installation point.
 
 
 13
 ...
 
 
 14
 I am scared to death of the cost of constructing Deadwood. We have little time to experiment to find the best methods. We have limited resources with which to do the job.
 
 
 15
 ...
 
 
 16
 While this is going on, Bill McCarty can be cooperating to resolve all of the pay request matters to bring us up to date with our billing. The bank should be so happy to see this happening, we should have another pay day before the plug is pulled on Deadwood.
 
 
 17
 (emphasis added).
 
 
 18
 Ultimately Electric Engineering failed to complete the project and was fired, Nugget Hydroelectric went bankrupt, and a subcontractor completed the project. Multiple lawsuits were filed in every direction. Electric Engineering sued other entities and people involved on the theory that their interference and failures to disclose had caused the overruns.
 
 
 19
 The claims against American Home, Electric Engineering's surety, went to trial, but were settled mid-trial. The claims by and against Electric Engineering never got to trial. After endless discovery disputes, the judge eventually dismissed Electric Engineering's claims as a discovery sanction. Electric Engineering had committed many discovery violations. The most critical had to do with hiding the memorandum quoted at length above. Electric Engineering appeals from dismissal of its claims against the construction lender (Credit Suisse), its project monitor (Calpine), the owner (Enervest, which owned Nugget), and various individual defendants.
 
 
 20
 Analysis.
 
 
 21
 The main issues on appeal boil down to these three: (1) did Electric Engineering waive its right to appeal the issues it does; (2) did the district court err in finding that Electric Engineering deliberately hid the memorandum; and (3) was hiding the memorandum a sufficient basis for so harsh a discovery sanction as dismissal?
 
 
 22
 A. Waiver.
 
 
 23
 Electric Engineering appealed the discovery sanction before judgment was entered as to all claims and all parties. We dismissed the appeal for lack of jurisdiction, because it was interlocutory. Valley Engineers v. American Home Assurance Co., 111 F.3d 139 (table), 1997 WL 191468, at 2 (9th Cir., April 17, 1997). Credit Suisse argues that because Electric Engineering did not appeal the dismissal as to Credit Suisse in that earlier appeal, only as to other defendants, it waived its right subsequently to appeal the sanctions order as to Credit Suisse. But none of its citations are on point, because in those cases, the appellate court had jurisdiction over the first appeal.
 
 
 24
 The point of the cases Credit Suisse relies on is that if a party has a chance to appeal a mistake to a court that can correct the error, and does not, then it should not be able to appeal the error when a subsequent occasion for appeal arises. Alioto v. Cowles Communications, Inc., 623 F.2d 616, 618 (9th Cir.1980) ("a new contention that could have been but was not raised"). The reason for this rule does not apply where the claimed error could not have been corrected because the appellate court lacked jurisdiction. An appeal that is dismissed because the appellate court lacks jurisdiction does not bar or waive a subsequent appeal when jurisdiction exists.
 
 
 25
 B. Willfulness.
 
 
 26
 For more than three years, Credit Suisse, taking the lead for defendants in discovery, had unfulfilled requests for production outstanding that covered the Carroll memorandum. For more than two years, Electric Engineering's lawyers violated court orders by failing to produce it. Several trial date settings had to be vacated because the discovery was incomplete. Warnings were given and monetary sanctions were imposed as Electric Engineering violated one court order after another. Even after, as a sanction, Electric Engineering had lost its attorney-client privilege regarding discovery requests, it continued to assert the nonexistent privilege regarding the Carroll memorandum. Finally, on the eve of a sanctions hearing, new lawyers for Electric Engineering produced the memorandum. Credit Suisse moved for case-dispositive sanctions, and got them.
 
 
 27
 The magistrate judge held two days of hearings, with testimony in person and by videotape, in order to resolve the sanctions motion. He found, after meticulous analysis of all the evidence, that Electric Engineering's "disobedience of the court's order was willful," and "the Carroll memorandum was intentionally withheld from disclosure in willful violation of the court's order." The district judge independently conducted a careful review of the magistrate judge's findings and recommendations in light of the objections submitted. The district judge reached the same conclusion, for the reasons mentioned by the magistrate judge and for some additional ones noted by the district judge.
 
 
 28
 Electric Engineering argues that this finding of fact was clearly erroneous. Its argument is that the Carroll memorandum had been produced to another party, Calpine, showing absence of willfulness, and that the memorandum was not so important that willfulness could be inferred from the fact of its nonproduction. Electric Engineering also argues that the nonproduction should be blamed on American Home, its performance bonding company that was managing the litigation during part of the litigation, not on Electric Engineering.
 
 
 29
 We have carefully reviewed the record and find ample support in it for the conclusions reached by the magistrate judge and district judge. The Carroll memorandum was what any experienced lawyer would call a "smoking gun." It showed that the man who knew the most about the construction project, the project manager, knew it could not be done as promised, had told the president of the company, and consciously viewed the company's conduct as a way to "have another pay day before the plug is pulled." The memorandum established that overwhelming obstacles to successful completion were known to Electric Engineering and were not the result of interference by the other participants in the project. It was a fair inference that Carroll would not have "agonized over the available evidence for the entire weekend and have made several false starts of this letter" if the substance of the letter was not viewed by him as especially agonizing and important. Willfulness was a fair inference from the fact that, in the euphemistic phrasing of the magistrate judge, the critical witnesses' testimony was "not credible."
 
 
 30
 The writer of the memorandum, John Carroll, testified in his first deposition that he did not recall writing any memorandum about the subject at the time. At that time, his interrogators did not have a copy of the memorandum. But they knew what to ask about, because a sharp-eyed associate, Kenneth M. Fitzgerald, had discovered a handwritten notation by one of the attorneys to another, heavily crossed out, and had obtained expert assistance in reading what was crossed out; it said "Carroll wrote a confidential memo 5/8/89 to Francis [Royer, the president of Electric Engineering] to say job can't be completed on time."
 
 
 31
 David Bunim, American Home's lawyer, had written this in a conference with Douglas Noll, Electric Engineering's lawyer. Bunim testified that he had crossed the notation out because when he asked Noll about it, he realized he had misunderstood, and was told that there was no such memorandum, and then continued to doodle away at it as they talked. Noll testified that he did not remember anything about this, and did not recall the Carroll memorandum. But someone in Mr. Noll's office had caused six copies of the Carroll memorandum to be put in various files immediately upon his receipt of it, and Noll had discussed it at length with Bunim. The magistrate judge found that Bunim's testimony was "simply not believable" because his other strike-outs did not obliterate notations so that they were unreadable, and because the obliteration was made with different colored ink. Also, American Home had similarly obliterated another damaging notation in another document when it was finally produced. The magistrate judge found that American Home had obliterated the notation after the court had found that American Home had waived its privilege claim and had acted in concert with Electric Engineering to hide evidence. The district judge likewise, after independent review of the evidence, found that "Mr. Bunim's testimony is not credible."
 
 
 32
 Eventually, after Electric Engineering had used Noll's firm, then Michael Gebers', then Rosenbaum's, then Pomeranz & Landsman assisted by Patrick Fabian, Mr. Fabian asked Rosenbaum's associate Jack Schwartz about the Carroll memorandum and Mr. Schwartz produced it to Mr. Fabian without hesitation. Mr. Fabian produced it to Credit Suisse on the eve of the scheduled hearing on Credit Suisse's motion for sanctions. None of the findings regarding dishonesty relate to Electric Engineering's current attorneys, including Mr. Fabian, and Pomeranz & Landman. In Carroll's second deposition, after his interrogators had obtained the memorandum and put a copy in front of him, Carroll admitted that he had written the memorandum and sent it to Royer. Royer testified that he had not seen Carroll's memorandum addressed to him, but the lines at the tops of the faxes showed that it had been faxed to his company's lawyers from his machine. Neil Rosenbaum, as Electric Engineering's lawyer, had written a letter to Royer obliquely referring to the Carroll memorandum.
 
 
 33
 Immediately before being replaced by Neil Rosenbaum as Electric Engineering's lawyer, Michael Gebers delivered five boxes of materials in response to a request for production by Calpine. The Carroll memorandum was in one of the boxes. Electric Engineering argues that this shows its failure to produce the materials to Credit Suisse was an accident. But Calpine's lawyer had put off reading the documents in the five boxes to minimize litigation expense to his client, because he thought he would win (as he did) on a dispositive motion he had filed on the ground that Electric Engineering lacked a required contractor's license. He told Rosenbaum that he had not yet read the papers in the boxes. Rosenbaum came over to his office with an associate and took the boxes back. Despite Calpine's lawyer's having had possession of the Carroll memorandum for six weeks, Rosenbaum knew that Calpine's lawyer had not seen the Carroll memorandum. In the context of all these facts, production to Calpine does not show, as Electric Engineering urges, that the district court clearly erred in finding willfulness of its nonproduction to Credit Suisse.
 
 
 34
 The district judge pointed out that inclusion of the Carroll memorandum in the boxes delivered to, but not read by, Calpine's lawyer, but omission of it in subsequent Electric Engineering production, supports the inference that Electric Engineering deliberately withheld production from Credit Suisse. The magistrate judge had called the Calpine production a "momentary lapse in EEC's otherwise persistent policy to suppress the Carroll memorandum." This "momentary lapse" implies more than mistaken honesty. Once the memorandum was in Electric Engineering's discovery materials retrieved by Rosenbaum, someone had to take the affirmative step of pulling it out.
 
 
 35
 What we describe above is evidence of a shocking betrayal of obligations to the court and opposing counsel, that led the magistrate judge and then the district judge to make a finding of fact that the Carroll memorandum was willfully hidden in a purposeful evasion of discovery obligations. The claim, "I don't remember," can be a lie if the speaker does remember, and even though no one can see another's memory, the falsity is subject to proof by circumstantial evidence, admissions, and other evidence. The district court finding that "the Carroll memorandum was intentionally withheld from disclosure in willful violation of the court's order" was not clearly erroneous.C. Appropriateness of sanction.
 
 
 36
 Electric Engineering argues that the district judge abused his discretion by imposing so harsh a sanction as dismissal. It says (1) it partially complied by producing thousands of pages of other documents; (2) one willful violation is not enough to justify dismissal; (3) the Carroll memorandum was not so important that nonproduction was seriously prejudicial; (4) there was no evidence that Electric Engineering had anything to do with its attorney's failure to produce the Carroll memorandum; (5) the district court did not adequately consider milder sanctions; and (6) Electric Engineering was not warned that so serious a sanction would be imposed if it did not produce the document.
 
 
 37
 Producing thousands of pages, but not the most important four pages, could be innocent in some circumstances, but there was no reason to think that omission of the Carroll memorandum was an innocent omission in this case. The failure to produce the Carroll memorandum was not a single violation of a single court order, so we need not decide whether, had it been, the violation would have justified dismissal. The request for production that should have elicited the Carroll memorandum was made in July of 1991. Electric Engineering did not comply. In December of 1991, the court ordered production within 10 days. The court ruled that by not responding to the July request for production, Electric Engineering had waived whatever objections it might have to it, and imposed a monetary sanction of attorneys' fees and expenses. That December 1991 order was violated by failure to produce the Carroll memorandum within 10 days, and by continued refusal to produce documents based on objections that the court had already ruled had been waived.
 
 
 38
 Electric Engineering cites Halaco Engineering Co. v. Costle, 843 F.2d 376 (9th Cir.1988), and Fjelstad v. American Honda Motor Co., 762 F.2d 1334 (9th Cir.1985), for the proposition that one willful violation of a court order is not enough to justify a case-dispositive discovery sanction. While Halaco in dicta so summarizes Fjelstad in a parenthetical, Halaco, 843 F.2d at 381, the parenthetical left out what is for this case the critical qualifying language in Fjelstad: "In these circumstances." Halaco and Fjelstad were carefully case-specific. Halaco reversed a case-dispositive sanction against the EPA for redacting a report and commissioning a report that accused someone of environmental violations without factual basis, but even though the district court had found that the redactions were not "a deliberate attempt to withhold evidence or deceive," and the unfair report would not be so prejudicial as to justify dismissal because "Halaco would have ample means to discredit the report." In Fjelstad, response to discovery had been exceedingly slow despite court orders to do it much sooner, but no willful deception was found, the untimeliness did not prejudice the other side, and there was nothing about the pattern of production to suggest an inference that the recalcitrant party's defenses were meritless. Fjelstad invited consideration of the facts of the particular case by its qualifications, "In these circumstances," and "in the circumstances presented by this record." The facts of the case at bar show dishonesty, not just recalcitrance and delay, regarding production of critical evidence.
 
 
 39
 The Carroll memorandum was exceedingly important, as we have explained. It destroyed Electric Engineering's claim that the difficulties arose from conditions it could not have anticipated when it signed the second version of the contract, because other parties hid the difficulties from it. There was plenty of evidence that Electric Engineering, not just its lawyers, was doing its best to hide the memorandum, such as the testimony of its president and of Carroll, but the sanction did not require such a finding. Link v. Wabash Railroad Co., 370 U.S. 626, 633-34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).
 
 
 40
 Electric Engineering is wrong on the facts and the law, in claiming that they were entitled to a warning they did not receive before dismissal could be an appropriate sanction. Federal Rule of Civil Procedure 37(b)(2) gives a district judge discretion to "make such orders ... as are just" in regard to a party's failure to obey a discovery order, including dismissal. Thus the central factor in evaluating the district court order is justice, and everyone has notice from the text of Rule 37(b)(2) that dismissal is a possible sanction for failure to obey discovery orders. We have come up with a five-part "test" to determine whether a dismissal sanction is just:
 
 
 41
 (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the [party seeking sanctions]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.
 
 
 42
 Malone v. United States Postal Service, 833 F.2d 128, 130 (9th Cir.1987). We have said that where a court order is violated, factors 1 and 2 support sanctions and 4 cuts against case-dispositive sanctions, so 3 and 5, prejudice and availability of less drastic sanctions, are decisive. Adriana International Corp. v. Thoeren, 913 F.2d 1406, 1412 (9th Cir.1990). We have said that factor 5 involves consideration of three subparts: whether the court explicitly discussed alternative sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of dismissal. Malone, 833 F.2d at 132. But despite all this elaboration of factors, we have said that it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning. Adriana, 913 F.2d at 1413.
 
 
 43
 Like most elaborate multifactor tests, our test has not been what it appears to be, a mechanical means of determining what discovery sanction is just. The list of factors amounts to a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof. The magistrate judge and district judge did expressly consider the factors we have listed. The list of factors also provides a non-exhaustive list of things we can think about in evaluating what the district judge did, subject to our deferential review for abuse of discretion. "Absent a definite and firm conviction that the district court made a clear error in judgment, this court will not overturn a Rule 37 sanction." Adriana, 913 F.2d at 1408.
 
 
 44
 The significance of warning is that a sanction may be unfair if the party could not have realized that it was in jeopardy of so severe a consequence if it was in error regarding its discovery posture. Rule 37 tells all lawyers and their clients that dismissal is possible if they violate discovery orders, and direct warnings or other circumstances may make it clear that it is a real risk of continued violation in the particular case. In this case, there could have been no doubt. The judge had already warned American Home, who engaged in the same discovery violations on the same side, mainly hiding the Carroll memorandum, that "any further discovery abuse by American will result in severe monetary or other sanctions, which may include any of those orders provided for by Fed.R.Civ.P. 37(b)(2)." Months before Electric Engineering disclosed the Carroll memorandum, the district judge reacted to Electric Engineering's repeated failure to produce its president, Royer, for deposition, by saying "I am highly disturbed by the shenanigans that Electrical Engineering is pulling and has been pulling for some time." The judge expressly warned that if Electric Engineering were to again "try to do something to frustrate the speedy disposition of the case," he would "consider striking Electrical Engineering's answer on the complaint and dismissing its counterclaim and other cross-actions." At that point, Electric Engineering knew it was in serious jeopardy of dismissal for violation of discovery orders. The district judge had repeatedly imposed monetary sanctions on Electric Engineering and its bonding company; the sanctions had not worked to shake the Carroll memorandum loose.
 
 
 45
 What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations "threaten to interfere with the rightful decision of the case." Adriana, 913 F.2d at 1412. While contumaciousness toward the court needs a remedy, something other than case-dispositive sanctions will often suffice. Dismissal is appropriate where a "pattern of deception and discovery abuse made it impossible" for the district court to conduct a trial "with any reasonable assurance that the truth would be available." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 352 (9th Cir.1995).
 
 
 46
 There is no point to a lawsuit, if it merely applies law to lies. True facts must be the foundation for any just result. Sometimes, as in Anheuser-Busch, a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts. The district court found that to be so in this case. The magistrate judge found that "EEC's conduct in the litigation has cast such a pall upon EEC's integrity and upon a fair and just resolution on the merits that no alternative sanction could be effective." The district judge expressly found this to be "a perfect expression" of the risk of prejudice and the inappropriateness of lesser sanctions.
 
 
 47
 It took years to shake loose the Carroll memorandum. Electric Engineering's adversaries probably would never have seen it, had Credit Suisse's lawyer not been sharp enough to spot what was not there, when he saw the obliterated handwritten note and another memorandum obliquely referring to it. Electric Engineering continued to refuse to produce the memorandum, and its witnesses continued to deny any recollection that such a memorandum existed, even after it was plain that Credit Suisse's lawyer had figured out that it must exist. Considering how Electric Engineering acted regarding the Carroll memorandum, it was a reasonable inference that if there was other discoverable material harmful to its case that its adversaries did not know about, it would be hidden forever. Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate. It was on this record.
 
 
 48
 D. Enervest and Calpine.
 
 
 49
 Credit Suisse was the only movant on its successful motion for dismissal as a discovery sanction. After the magistrate judge issued his first set of findings and recommendations favorable to Credit Suisse's motion, Calpine (Credit Suisse's monitoring engineer) and Enervest (owner of the Nugget Hydroelectric) made similar motions. They won, and Electric Engineering argues that even if the dismissal of its claims against Credit Suisse stands, it should be allowed to pursue its claims against Calpine and Enervest. Electric Engineering argues that Enervest had not even made a discovery request requiring production of the Carroll memorandum, Electric Engineering had produced the memorandum to Calpine (the unread five boxes discussed above), and there had been no court order requiring production to Calpine and Enervest that was violated.
 
 
 50
 The magistrate judge considered all these points, and found against Electric Engineering. The magistrate judge found that because Electric Engineering's claims against the other defendants were "essentially the same" as its claims against Credit Suisse, "it would not be just to allow EEC to continue to assert them against any party." That Calpine's attorney had possession of the Carroll memorandum but did not know it for six weeks until Rosenbaum took it back, did not entitle Electric Engineering to continue to litigate with Calpine, because Electric Engineering's willful withholding of the Carroll memorandum "had seriously impaired the public interest in expeditious resolution" and had "cast a pall upon the disobedient parties' integrity and the expectation that this case is capable of a fair and just resolution on the merits."
 
 
 51
 Electric Engineering would ordinarily have had 10 days from service to object to the magistrate judge's findings and recommendations. Federal Rule of Civil Procedure 72(b). But in response to Electric Engineering's request for more time, the magistrate judge provided in his written order that any party could file objections "within 20 days after service." Service was April 22, but the objections were not filed until May 20, which was late. Electric Engineering argues that intermediate weekend days should be excluded because the 20 days should be viewed as two 10-day periods, and weekends are excluded from 10-day periods under Federal Rule of Civil Procedure 6(a). The argument is frivolous. Rule 6(a) says intermediate weekends are excluded "[w]hen the period of time prescribed or allowed is less than 11 days." Twenty is more than 11. Allowing the three days for service by mail pursuant to Rule 6(e), and the extra day if the last day is Sunday under Rule 6(a), opposition was due Monday May 16.
 
 
 52
 The district judge deemed Electric Engineering to have waived objection to the magistrate judge's findings and recommendations and dismissed Electric Engineering's claims against the remaining defendants. As to American Home, the judge considered the identical objections on the merits, and reached the same conclusion, because of the "nexus" between American Home's wrongful conduct and its claims.
 
 
 53
 Our law on waiver is somewhat difficult to apply. We have held that forfeiture or waiver is not complete on dispositive motions, but goes only to factual findings, leaving parties free to appeal the magistrate judge's conclusions of law. Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir.1991). But in Simpson v. Lear Astronics Corp., 77 F.3d 1170, 1174, n. 2 (9th Cir.1996), we noted that our cases have been inconsistent on whether failure to object on dispositive motions effects a complete forfeiture of the right to appeal. We need not resolve the question here, because we would affirm if Electric Engineering's objections were waived, and also if we review on the merits.
 
 
 54
 The district court's authority where a party fails to obey an order, as the magistrate judge pointed out, is to "make such orders in regard to the failure as are just." Federal Rule of Civil Procedure 37(b)(2). The rule does not limit the court to rewarding the party wronged. Payne v. Exxon Corp., 121 F.3d 503 (9th Cir.1997). In Payne, we upheld dismissal in favor of a party that had not been a party to the violated discovery requests. The wrong from hiding the Carroll memorandum and lying about it was not merely to Credit Suisse, but to all the parties Electric Engineering sued, and to the system of justice itself. The Carroll memorandum was important to all the parties, because the claims were materially similar, and all the other parties were working together on discovery with Credit Suisse taking the lead. Although Calpine's lawyer had possession of the memorandum for six weeks, until Rosenbaum took it back, he did not know he had it and he never saw it, because of his reasonable decision to defer reading it pending disposition of his well-founded 12(b)(6) motion.
 
 
 55
 As the magistrate judge said, Electric Engineering's violations of court orders regarding discovery "had seriously impaired the public interest in expeditious resolution," referring to the several continuances of the trial that had been necessitated, and the three years wasted in nothing but a struggle to obtain discovery of what should have been promptly produced. Likewise, as the magistrate judge said, hiding the Carroll memorandum and lying about it had "cast a pall upon the disobedient parties' integrity and the expectation that this case is capable of a fair and just resolution on the merits." There was no more reason to expect that everything was finally disclosed so that Calpine and Enervest could obtain a fair trial than there was for Credit Suisse.
 
 
 56
 Conclusion.
 
 
 57
 The judgment of the district court is AFFIRMED.