**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

G. CLINTON MERRICK, JR.,
         *Plaintiff-Appellee,*

v.

PAUL REVERE LIFE INSURANCE
COMPANY; PROVIDENT LIFE &
ACCIDENT INSURANCE; UNUM
PROVIDENT,
         *Defendants-Appellants.*

No. 05-16380
D.C. No.
CV-00-00731-JCM

G. CLINTON MERRICK, JR.,
         *Plaintiff-Appellee,*

v.

PAUL REVERE LIFE INSURANCE
COMPANY; PROVIDENT LIFE &
ACCIDENT INSURANCE; UNUM
PROVIDENT,
         *Defendants-Appellants.*

No. 05-17059
D.C. No.
CV-00-00731-JCM
OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
May 16, 2007—San Francisco, California

Filed August 31, 2007

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Sandra S. Ikuta, Circuit Judges.

11109

Opinion by Senior Circuit Judge Hall

**COUNSEL**

Evan M. Tager, Mayer, Brown, Rowe & Maw, Washington, DC, for the defendants-appellants.

Thomas L. Hudson, Osborn Maledon, Phoenix Arizona, for the plaintiff-appellee.

## OPINION

HALL, Senior Circuit Judge:

Defendants Paul Revere Life Insurance Company and Unum Provident Corporation (collectively "the insurers") appeal the district court's jury verdict awarding $1.65 million in compensatory and $10 million in punitive damages to plaintiff G. Clinton Merrick, Jr. for breach of contract and of the duty of good faith and fair dealing, stemming from the insurers' denial of Merrick's disability insurance claim. Among other issues, this appeal requires us to examine the constitutional limits upon the use of evidence of injury inflicted upon nonparties, as discussed in *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). The district court had jurisdiction pursuant to 28 U.S.C. § 1332. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for a new trial on punitive damages due to the district court's failure to give an adequate limiting jury instruction under *Williams*.

## I.   Background

### A.   *History of Merrick's Claim*

G. Clinton Merrick, Jr. purchased an "own occupation" disability policy from defendant Paul Revere Life Insurance Company in 1989. Under that policy, if Merrick was "unable to perform the important duties of [his] Occupation" due to "Injury or Sickness," he was entitled to a "total disability" benefit of $12,000 per month for the duration of his disability. At the time, Merrick was one of three partners at a venture capital firm, responsible for raising capital, evaluating invest-

ment options, and participating as a director in companies in which the firm invested. Merrick had entered the venture capital arena following a successful career as a marketing executive, where his accomplishments included campaigns for Country Time Lemonade, Crystal Light drink mix, and the "Kool-Aid Man."

In the early 1990s, Merrick began suffering from fatigue, muscle pain, mental confusion, and other difficulties that affected his work performance. His attending physician, Dr. Simon Epstein, referred him to several specialists to identify the problem. In August 1993, Dr. Stuart Mushlin indicated that Merrick may be suffering from Chronic Fatigue Syndrome (CFS) and found him unable to work. This diagnosis coincided with his partners' decision to buy out Merrick's interest in the firm due to recent underperformance, which Merrick attributed to his health problems.

Merrick first alerted Paul Revere to his disability on May 31, 1994, stating that he was "suffering from a disabling condition" but was not yet filing a claim. Merrick then met with additional specialists and underwent a battery of specialized tests at the Mayo Clinic, some of which showed normal results and some of which indicated abnormalities. Dr. Michael Silber, summarizing the Mayo Clinic results, diagnosed Merrick as suffering from CFS and Lyme Disease, and advised that he "restart work at a much lower stress level than previously." By this time Merrick was under the regular care of Dr. Alan Rapaport rather than Dr. Epstein; both Epstein and Rapaport concurred with the CFS diagnosis and found Merrick unable to work.

Following the Mayo Clinic's confirmation of the CFS diagnosis, Merrick filed a formal claim with Paul Revere. Paul Revere's in-house physician reviewed Merrick's documentation, questioned the diagnosis but ultimately agreed that the records supported a finding of "significant impairment."

Therefore Paul Revere began paying out Merrick's claim as of December 1994, when his benefits began to accrue.

Merrick tried to start a new venture capital firm in late 1994, but his illness prevented him from getting beyond the initial stages. Merrick's other insurer, Northwestern Mutual, notified Paul Revere in June 1995 that Merrick was seeking to enter a new business venture. That August, a Paul Revere field representative offered to settle Merrick's claim for an amount equal to four months of disability benefits, citing the "return to work and recovery" provision of his claim. Merrick declined, whereupon the representative left him with a check for one month of benefits. Merrick returned this check because he believed an endorsement provision on the check would have settled his claim upon cashing.

Paul Revere then arranged for Dr. James Donaldson to perform an Independent Medical Examination in December 1995. Dr. Donaldson's report was inconclusive: based on his tests, he concluded that Merrick "does not have either an active neurological problem or active Lyme disease" but did note his chronic fatigue, attributing it to depression. He also found that Merrick "deserves aggressive treatment, both pharmacotherapy and psychotherapy, by a seasoned psychiatrist." Paul Revere's claim file shows that the company interpreted Donaldson's report as supporting "significant impairment," and as implying that Merrick could not return to work.[1] Dr. Rapaport, Merrick's treating physician, disputed Dr. Donaldson's conclusions and reiterated his CFS diagnosis.

Paul Revere conducted an intensive review of Merrick's claim file, which concluded that "there does not appear to be any neuropsychologically-based disability." The field repre-

---

[1]Dr. Donaldson's report did not explicitly state whether he thought Merrick could return to work. Paul Revere's internal examiner recommended that the company ask Donaldson to clarify his findings in this regard, but apparently this follow-up never happened.

sentative again offered a compromise settlement, which Merrick refused. On December 9, 1996, Paul Revere denied Merrick's claim on the ground that the internal review showed "no objective medical documentation which supports an inability to perform the duties of your occupation as a venture capitalist." After Merrick protested, Paul Revere agreed to pay two additional months of benefits while Merrick provided the company with objective medical evidence. But the company's medical consultants rejected the two follow-up reports Merrick offered to document his illness, so Paul Revere continued to deny Merrick's claim. Merrick filed suit against Paul Revere and its parent corporation, Unum Provident, in April 2000, claiming breach of contract and of the duty of good faith and fair dealing.

### B.  Pretrial Motion in Limine

Merrick sought production of all documents added to Paul Revere's claim file after Merrick brought suit. The insurers resisted this request, citing among other reasons attorney-client privilege. After Merrick brought a motion to compel production, the magistrate judge warned the insurers that failure to produce a privilege log would waive privilege and instructed the insurers not to invoke the privilege unless the claim file actually included privileged material. Paul Revere then reiterated its privilege objection in a supplemental response to Merrick's document request, without producing a privilege log, and attested that "[n]otwithstanding and subject to these objections," it had produced all responsive documents.

In the meantime, Merrick discovered that when he filed this suit, counsel for the insurers assumed active management of the Merrick claim file. As a result, he became concerned that the insurers were using the attorney-client privilege to shield otherwise responsive documents from discovery, by claiming they were privileged communications between the insurers and counsel rather than routine documents related to claims

adjustment. Merrick sought another hearing before the magistrate judge, who granted Merrick's motion to compel, held all privileges waived and ordered the insurers to produce all responsive documents. The insurers produced no additional documents in response; indeed, Unum Provident reiterated its privilege claim in a later discovery response.

Merrick then brought a motion in limine to suppress all documents in his claim file acquired after litigation commenced, on the ground that the insurers were picking and choosing which documents would be produced in discovery. In response, the insurers stated that no documents had been withheld on the basis of privilege, although at the hearing counsel for the insurers suggested in passing that such privileged documents existed. Merrick found this representation incredible, given that the insurers had collected over 3,000 pages of documents following the filing of the suit yet produced only three short memos analyzing that material. Merrick insisted before the district judge that the insurers were hiding evidence and demanded production of all "post-litigation notes" and other documents reflecting the "thought processes" underlying management of Merrick's claim. The district court judge granted the motion in limine, and at trial suppressed much of this documentation on the ground that defendants were picking and choosing which documents to produce. After the court granted the motion in limine, the insurers submitted a declaration stating that they did not withhold any documents on the basis of privilege.

## C.   Trial

At trial, Merrick argued that the denial of his claim was part of a larger scheme to "scrub" the company's liability for expensive and noncancellable "own occupation" disability policies. Merrick relied largely upon the testimony of Stephen Prater, an insurance industry expert, who testified regarding Unum Provident's allegedly aggressive and unethical claim-closing practices. These practices included pressuring claim-

ants to settle for a fraction of total benefits, insisting upon "objective medical evidence" of a disability even when the policy did not require such evidence, building a stable of biased Independent Medical Examiners who would support claim denials, and holding regular "round table" meetings with lawyers, doctors, and claims handlers designed to "triage" the most expensive claims. Merrick introduced a substantial number of internal Unum Provident memos showing the evolution of this scheme during the early 1990s, and Prater testified regarding the tremendous financial gains Unum Provident posted by adopting these "best practices."

Unum Provident announced a merger with Paul Revere, Merrick's insurer, in April 1996. Prater testified that in the months leading up to the merger, Unum Provident began importing its "best practices" procedures to the Paul Revere organization, including training its claims representatives in "objectification" and "round tabling" Paul Revere claims. Prater testified that Paul Revere representatives received this training shortly before the company began re-evaluating Merrick's claim (which it had initially paid out). Prater testified that the company's handling of Merrick's claim was consistent with many of Unum Provident's improper practices, including attempting to settle for a fraction of the total amount (and threatening to sue for reimbursement if Merrick refused to settle), insisting upon "objective medical evidence" and seeking to get Merrick's claim off the books before the end of the fiscal year. Merrick also argued that the explanations Paul Revere gave Merrick for denying his claim were inconsistent with the company's internal documentation, which largely supported the conclusion that Merrick suffered "significant impairment."

The jury returned a verdict for Merrick, awarding him $1,147,355 in unpaid benefits and $500,000 for mental and emotional distress, to be paid by the insurers jointly and severally. It also imposed $2,000,000 in punitive damages on Paul Revere and $8,000,000 on Unum Provident. The insures

brought a renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure and a motion for a new trial under Rule 59. The judge denied these motions and awarded Merrick $500,000 in attorney's fees. The insurers timely appealed.

## II.   Discussion

The insurers appeal several decisions made by the court below. We address each argument in turn.

### A.   Motion for New Trial

In their opening brief, the insurers argue that they are entitled to judgment as a matter of law on the issues of bad faith and punitive damages. Merrick responds, correctly, that the insurers did not include these claims in their Rule 50 motion below, meaning the issue is not properly before us now. *Desrosiers* v. *Flight Int'l, Inc.*, 156 F.3d 952, 957 (9th Cir. 1998). In their reply brief, the insurers concede the point and ask the court to construe their argument as an appeal of their Rule 59 request for a new trial, which did raise these arguments.

Generally, issues raised for the first time in a reply brief are considered waived. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990). Here, however, we exercise our discretion to consider the insurers' claim because the appellee has not been misled and the issue has been fully explored. *See Ellingson v. Burlington N., Inc.*, 653 F.2d 1327, 1332 (9th Cir. 1981). The insurers' Rule 59 argument is identical to their Rule 50 argument, to which Merrick has responded. We note, however, the differing standard of review. Whereas a properly presented Rule 50 question is reviewed de novo, we give "great deference" to the trial court's denial of a motion for a new trial, and will reverse "for a clear abuse of discretion only where there is an *absolute absence of evidence* to support the jury's verdict." *Desrosiers*, 156 F.3d at 957

(emphasis in original) (quoting *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656-57 (8th Cir. 1995) (White, J.)).

**[1]** Given this deferential standard of review, we find the evidence more than sufficient to support the jury's bad faith verdict. Under Nevada law, "[b]ad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct." *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956 (Nev. 1998) (citation omitted). Viewing the evidence in Merrick's favor, *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 774 (9th Cir. 2005), the jury could have found that the insurers conducted a biased investigation of Merrick's claim as part of an improper company-wide initiative to target and terminate expensive "own occupation" policies. It also could have found that the insurers misrepresented the terms of the policy by requiring Merrick to present "objective medical evidence" of his disability. The Nevada Supreme Court recognizes biased investigations and misrepresentation of policy terms as evidence of bad faith. *See Powers v. U.S.A.A.*, 962 P.2d 596, 604 (Nev. 1998); *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956 (Nev. 1998). We have previously found that these defendants' improper claim-scrubbing supports a finding of bad faith claim denial in a case decided under California law, which like Nevada anchors bad faith liability in the reasonableness of the insurer's action. *See Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1010-11 (9th Cir. 2004).

**[2]** Similarly, there was substantial evidence before the jury that the insurers should be liable for punitive damages. Under Nevada law, a plaintiff may secure punitive damages upon showing "by clear and convincing evidence" that the defendant is "guilty of oppression, fraud, or malice, express or implied." Nev. Rev. Stat. 42.005. Here, the jury could have concluded that by subjecting Merrick's claim to improper claim-scrubbing procedures, the insurers "undertook an intentional course of conduct designed to ensure the denial" of the claim. *See Powers*, 962 P.2d at 604-05. Both the Nevada

Supreme Court and the Ninth Circuit have held that such conduct could constitute "fraud and malice." *Id.* at 605; *see also Hangarter*, 373 F.3d at 1012-13 (California law).[2]

**[3]** Because we cannot say that there was a "complete absence of evidence" to support the jury's verdicts, we affirm the district court's denial of the insurers' Rule 59 motion.

## B.   Motion in Limine

**[4]** The insurers also challenge the district court's order suppressing certain evidence placed in the claim file after litigation commenced. The district court granted this motion upon finding that the insurers withheld evidence that they were ordered to produce regarding their post-litigation treatment of Merrick's claim. The insurers argue that the court erred in finding that they had withheld any evidence. "Courts need not tolerate flagrant abuses of the discovery process" and have "inherent power" to exclude evidence as a sanction for such abuses. *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). We review the imposition of discovery sanctions for abuse of discretion and the underlying factual determinations for clear error. *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1052 (9th Cir. 1998).

---

[2]The insurers argue that Merrick offered insufficient evidence linking Unum Provident's illicit practices to Paul Revere's handling of this claim, because Paul Revere denied the claim before the merger was completed. Merrick showed that Unum Provident engaged in claim-scrubbing prior to the merger, and that Paul Revere began importing Unum Provident's "best practices" in claim management before the merger was completed. He also showed that his claim, which Paul Revere initially granted, was re-evaluated and ultimately denied shortly after this transition period began. Prater testified that Paul Revere's behavior, such as pressuring the claimant to settle before year's end and relying upon a lack of objective medical evidence to terminate an expensive claim, was consistent with Unum Provident's tactics. Therefore we cannot say that there was an "absence of evidence" supporting Merrick's claim that Paul Revere adopted Unum Provident's illicit behavior before the merger was finalized and applied it in this case.

Based upon the record, we cannot conclude that the district court's finding that the insurers withheld evidence is clearly erroneous. The insurers' pretrial behavior gives rise to such an inference. The insurers invoked the privilege in response to a specific document production request, and continued to do so even after the magistrate judge instructed them not to invoke the privilege unless the privilege was actually shielding documents. Their responses expressly objected on the basis of privilege and attested that "subject to these objections," their production was complete.[3] Only after the magistrate ordered the privileges waived (in response to Merrick's assertion that defendants were withholding evidence), and Merrick brought his motion in limine, did the insurers state unequivocally that no documents were withheld on the basis of privilege.[4] Even then, counsel's statement at the hearing could be understood as admitting the existence of withheld documents.

In addition, the existence of withheld documents may be inferred from the paucity of material actually produced. Although the insurers received over 3000 pages of documents pertaining to Merrick's claim after litigation began, it produced only three short memos analyzing this material, none

---

[3]As noted above, Unum Provident continued to use this language even after the magistrate judge ordered all privileges waived.

[4]Defendants claim they offered an unequivocal denial prior to the magistrate's ruling. The record does not support this assertion. The insurers' opposition to the motion to compel states that they "are not in possession of any additional documents responsive to these requests" as of May 31, 2001, but this statement is followed on the next page by a reiteration of the privilege with respect to this specific document request. We also note that subsequent events cast doubt upon the truth of that denial: following the hearing on the motion to compel, defendants produced a February 2, 2001 e-mail from Dr. Cusher to Dave Layden, the in-house counsel managing the Merrick file and a report from Dr. Cusher dated May 5, 2001. The dates on those documents strongly suggest that they were in the insurers' possession, but not disclosed, on May 31, 2001.

of which was generated by the attorneys who were actively managing the case file after Merrick filed his complaint.[5]

**[5]** Against these facts, the defendants offer only their sworn statement that documents were not withheld. While proving a negative is difficult, the defendants' pre-trial conduct and the dearth of documents actually produced support an inference that the defendants withheld documents in violation of the magistrate's order. Given the district court's superior position to adjudge the insurers' culpability, we conclude that the district court did not clearly err in so finding, and did not abuse its discretion in granting Merrick's motion in limine.

## C.   Punitive Damages Jury Instruction

Merrick's bad faith and punitive damages claims turned upon linking Paul Revere's handling of Merrick's claim to a decade of allegedly improper claims handling practices at Provident. Prater testified regarding Provident's practices in substantial detail. Concerned that the jury would punish them for Provident's history of improper behavior, the insurers requested the following instruction, which the district court denied:

> In deciding whether or in what amount to award punitive damages, you may consider only the specific conduct by Defendants that injured Plaintiff. You may not punish Defendants for conduct or practices that did not affect Plaintiff, even if you believe that such conduct or practices were wrongful or deserving of punishment. The law provides other means to punish wrongdoing unrelated to Plaintiff.

---

[5]One was an e-mail from Dr. Cusher to in-house counsel and therefore could have been considered privileged, as defendants noted in their disclosure.

The insurers claim that this denial abridged their Due Process rights by exposing them to unconstitutionally excessive punitive liability.

Initially, Merrick asserts that the insurers have waived the jury instruction issue. *Voohries-Larson v. Cessna Aircraft Co.*, 241 F.3d 707, 713 (9th Cir. 2001). We disagree. Although the Ninth Circuit is "the strictest enforcer of Rule 51," the record here shows that the insurers "objected at the time of trial on grounds that were sufficiently precise to alert the district court" to the specific nature of the defect. *Id.* at 713-14 (citation omitted). The insurers explicitly objected to the court's punitive damages instructions without "some limiting . . . instructions relative to the *Campbell* decision [*State Farm v. Campbell*, 538 U.S. 408 (2003)] in terms of what the jury can look at and not look at," and set forth five specific limiting instructions on those points. This objection is sufficiently precise to "bring into focus the precise nature of the alleged error" as being inconsistent with *Campbell*. *Voohries-Larson*, 241 F.3d at 714.

**[6]** The Due Process Clause "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). As the Supreme Court has recently explained, such punishment runs afoul of the maxim that a state must afford a defendant an opportunity to present every available defense. *Id.* (citing *Lindsey v. Normer*, 405 U.S. 56, 66 (1972)). A defendant "threatened with punishment for injuring a nonparty victim" may be unable to present defenses applicable to the nonparty victim, if those defenses do not also coincide with those relevant to the plaintiff's claim. *Id.* In addition, punishment for nonparty injury adds "a near standardless dimension to the punitive damages equation," as jury speculation regarding the number of nonparties injured and the extent of their injuries magnifies traditional due process concerns regarding the arbitrariness, uncertainty, and lack of notice afflicting a punitive award.

**[7]** *Williams* clarified that a plaintiff may offer evidence of "harm to other victims" to show the reprehensibility of a defendant's conduct in this case. *Id.* at 1063-64. "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Williams,* 127 S. Ct at 1064. But "a jury may not go further than this and use a punitive damages verdict to punish a defendant *directly* on account of harms it is alleged to have visited on nonparties." *Id.* (emphasis added). Where there is a "significant" risk that the jury might do so—a risk generated, for example, by "the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury"—a court, upon request, must "provide *some* form of protection" to assure that juries "are not asking the wrong question." *Id.* at 1064, 1065.

**[8]** In this case, the evidence that was introduced at trial created a significant risk that the jury would punish the defendants for Provident's history of improper behavior and the damages this behavior caused to victims other than Merrick. Prater testified at length regarding Provident's practices based on his analysis of "over a hundred thousand" internal Provident documents written throughout the 1990s, many of which were entered into evidence. Prater and the memos describe Provident's decade-long scheme in great detail, highlighting unethical behavior by Provident that was unrelated to Paul Revere's handling of Merrick's claim.[6] For example, Provident held round-table discussions to terminate expensive policies, destroyed all records of the meetings and labeled them as "legal" solely to shield them by privilege. But Merrick offered no evidence that his claim was improperly "round-tabled." Prater also explained that Provident cultivated biased

---

[6]As noted above, Merrick showed that Paul Revere's handling of his claim displayed *some* of Provident's allegedly unethical practices, such as pressuring claimants to settle and insisting upon objective medical evidence of a claim.

independent medical examiners to support termination decisions, although Merrick seemingly did not allege that Dr. Donaldson's examination of him was biased. In his closing argument, Merrick's attorney repeatedly referenced Provident's pattern of allegedly unethical behavior, including practices not alleged to have occurred in Merrick's case. He also asked, in the context of punitive damages, "[h]ow do you punish a corporation that's making on the order of $132 million a quarter in terminations? That's what you have to decide." We conclude that the evidence offered here creates a "significant risk" that the jury would assess punitive damages to punish this pattern of unethical behavior rather than the conduct that affected Merrick specifically.[7]

[9] Merrick argues that, taken as a whole, the instructions adopted by the court adequately protected the insurers' due process rights. We disagree. The punitive damages instruction stated that "[y]ou may in your discretion award such damages, if, but only if, you find by a clear & convincing evidence that said defendant was guilty of oppression fraud or malice in the conduct upon which you base your finding of liability." The verdict form further asked whether the insurer "act[ed] with oppression, fraud, or mailice [sic], express or implied, in its dealings with plaintiff such to justify an award of punitive damages." At most, these instructions address *liability* for punitive damages but do not prevent the jury from setting an *amount* of damages that includes direct punishment for harm to others. *Williams* states clearly that "a jury may not . . . use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id.* at 1064. A jury instruction, like that presented here, that allows (or does not preclude) direct punishment for nonparty

---

[7]As the insurers note, the fact that the jury assessed $2 million in punitive damages against Paul Revere and $8 million against Unum/Provident —which did not handle Merrick's claim but was the primary focus of Prater's testimony—suggests that the jury did assess damages to punish Provident's conduct against nonparties.

harm runs afoul of this prohibition and invites precisely the improper jury speculation—as to, for example, the number of nonparty victims or the extent of their injury—that *Williams* sought to avoid. *Id.* at 1063; *see also Campbell*, 538 U.S. at 423 ("Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant.").

**[10]** More important, the instructions given did not provide the jury with clear direction regarding the proper and improper uses of Merrick's "bad company" evidence. As noted above, the jury was permitted to consider this evidence when determining the reprehensibility of the insurers' actions toward Merrick, but it could not directly punish the defendants for harm to victims other than Merrick. When evidence is admissible for a limited purpose, the opponent is entitled to a limiting instruction admonishing the jury not to use the evidence for a forbidden purpose. Fed. R. Evid. 105; *see Borunda v. Richmond*, 885 F.2d 1384, 1388 (9th Cir. 1988). No such instruction issued here. In light of *Williams'* statement that it is "*constitutionally* important for a court to provide assurance that the jury will ask the right question, not the wrong one," 127 S. Ct. at 1064 (emphasis added), we conclude that the instruction issued in this case was inadequate.

Merrick also argues that the court properly denied the proposed instruction because the insurers' instruction was misleading. *Mitchell v. Keith*, 752 F.2d 385, 388 (9th Cir. 1985). Merrick is correct that the first sentence of the proposed instruction is misleading because it fails to indicate that the jury may consider harm to others as part of its reprehensibility analysis. *Williams*, 127 S. Ct. at 1063-64. But the fact that the proposed instruction was misleading does not alone permit the district judge to summarily refuse to give any instruction on the topic. In *Mitchell*, the primary case upon which Merrick relies, the court affirmed the district court's denial because the proposed instruction was misleading *and* the existing instruction adequately addressed the movant's concern. *Mitchell*,

752 F.2d at 389. Where a proposed instruction is supported by law and *not* adequately covered by other instructions, the court should give a non-misleading instruction that captures the substance of the proposed instruction. *See Ragsdell v. Southern Pac. Transp. Co.*, 688 F.2d 1281, 1283 (9th Cir. 1982).

**[11]** We therefore conclude that the district court erred in failing to instruct the jury that it could not punish the defendants for conduct that harmed only nonparties. *Williams* suggests in passing that a panel may remedy this error either by granting a new trial or reducing the amount of punitive damages. *Williams*, 127 S. Ct. at 1065. While remittitur may remedy a jury award deemed unconstitutionally excessive, *see Planned Parenthood of Columbia/Willamette Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 963 (9th Cir. 2005), it seems less appropriate where the constitutional error stems from misguidance regarding the way the jury may use evidence in setting an amount. We therefore vacate the punitive damages verdict and remand the case for a new trial on punitive damages. *Larez v. Holcomb*, 16 F.3d 1513, 1520 (9th Cir. 1994). In light of this holding, we decline to reach the insurers' challenge that the punitive award was unconstitutionally excessive. *See Williams*, 127 S. Ct. at 1065.

*D.   Attorney's Fees*

**[12]** Merrick sought attorney's fees under Nevada Revised Statute § 18.010(2)(b), which permits a fee award only where the opposing party maintained the suit "without reasonable ground or to harass the prevailing party." At the post-trial hearing, the district court explicitly found that the evidence was such that "the case could have gone either way." But it nonetheless reluctantly awarded Merrick fees based upon its reading of *Farmers Home Mutual Insurance Co. v. Fiscus*, 725 P.2d 234 (Nev. 1986). In *Fiscus*, the Nevada Supreme Court affirmed the district court's award of attorney's fees in a bad faith insurance case. The district court here interpreted

*Fiscus* as creating a categorical rule that "a finding of bad faith against the insurance company was at least tantamount to finding that [insurer's] defense was maintained without reasonable ground." The trial judge stated clearly that "[w]ithout the *Fiscus* case, I don't think I would award attorneys' fees in this case."

The district court misread *Fiscus*, although its mistake was understandable. The trial court in *Fiscus* granted attorney's fees on the ground that where the bad faith ruling is based on an insurance company's unreasonable interpretation of a policy, then a defense based on the same unreasonable interpretation constitutes an unreasonable ground for maintaining the suit. *Fiscus*, 725 P.2d at 235-37. But the Nevada Supreme Court explicitly found that, in light of the district court's factual findings regarding the extent of Farmers' bad faith, it was "unnecessary" to address this legal conclusion. *Id.* at 237 n.3. *Fiscus* therefore declined to create a categorical rule. We note that four months after *Fiscus* was decided, the same court in another bad faith insurance case reviewed the trial court's bad faith and attorney fee findings separately; if *Fiscus* had indeed created a categorical rule there would have been no need to separate the analysis. *See Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352 (Nev. 1986). Moreover, even if *Fiscus* purported to create a categorical rule, it could not have, as Nevada law prohibits courts from expanding or altering legislative rules for fee-shifting. *See First Interstate Bank v. Green*, 694 P.2d 496, 498 (Nev. 1986).

**[13]** The district court's award was therefore based upon a misreading of *Fiscus*. The court explained that absent the *Fiscus* decision it would not have awarded fees, and Merrick seemingly does not challenge the court's finding that this case "could have gone either way." We therefore reverse the district court's attorney fee award.

## III.   Conclusion

We affirm the district court's denial of the insurers' motion for a new trial and its grant of Merrick's motion in limine. We

vacate the punitive damages verdict and remand for a new trial on punitive liability. We also reverse the attorney fee award. Each party shall bear its own costs on appeal.

AFFIRMED in part; REVERSED in part; VACATED in part, and REMANDED.